Arnold Leonard KAHN, Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 29, Docket 26882.

United States Court of Appeals
Second Circuit.

Argued Oct. 30, 1961.

Decided Dec. 7, 1961.

John F. Reddy, Jr. (of Engel, Judge, Miller & Reddy), New York City (George J. Gardella, Jr., New York City, on the brief), for petitioner.

Allan F. Conwill, Securities and Exchange Commission, Washington, D. C. (Peter A. Dammann, Gen. Counsel, David Ferber, Asst. Gen. Counsel, Sidney D. Goldberg, Sp. Counsel, and Faith Colish, Atty., Securities and Exchange Commis-

sion, Washington, D. C., on the brief), for respondent.

Before CLARK, FRIENDLY and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

This petition for review of an S.E.C. order arises out of the same proceedings described in our opinion in Berko v. S.E.C., 297 F.2d 116. The general background may be found there. As in Berko, we conclude the S.E.C.'s findings and reasoning lack the clarity necessary to enable us to make a considered judgment without substituting our own findings and legal theories.

The gist of the SEC's opinion is as follows:

"We found in our previous opinion (at p. 5) that 'Kahn told one customer, who purchased 25 shares at 3½ in June 1958, that Sports expected to have ten [bowling] arenas in operation by the end of the year, and that, if such expectation were realized, its projected earnings would be about $1.18 per share based on the past performance of other bowling companies.' We noted that these optimistic representations were made before any financial information concerning Sports' operations was available, and concluded that Kahn 'had no adequate foundation' for his optimism and that he should at least have disclosed to his customer 'that no financial information was available and cautioned [him] * * * as to the risk involved in purchasing the stock in the absence of such information.' We further concluded that Kahn 'should have disclosed to what companies he was comparing Sports or how long they had been in business, any material differences or similarities between Sports and such companies and any other facts necessary to make the comparison fair.'

*     *     *     *     *     *

"Kahn asserts that his projection of the number of arenas to be operated, which he now admits was 'mistaken' to the extent that it referred to 10 rather than 16 arenas, 'was based upon literature supplied to him which he referred to in good faith.' If the literature he refers to is that contained in the record, as he previously asserted, we can only repeat what we said in our earlier opinion (at p. 7, no. 14) that such literature 'had not yet been published by registrant at the time Kahn made the statement to his customer.' On the other hand, if Kahn is referring to other literature, it is not in the record before us, and cannot constitute a basis for excusing his erroneous projection.

*     *     *     *     *     *

"We accordingly reaffirm our conclusions that Kahn 'either knew there was no adequate basis for the optimistic statements' he made or he was 'grossly careless or indifferent as to the existence of an adequate basis' for his statements, that he willfully violated or aided and abetted in registrant's willful violations of the designated anti-fraud provisions, and that he was a cause of the revocation of registrant's broker-dealer registration."

As in Berko, counsel for the Commission stated this case was important because of the need to end so-called "boiler room" operations. Again, as in Berko, we note the legal theories advanced in the agency's opinion would apply to all sales of securities whether or not effectuated in a "boiler room" context.

In the Commission's view petitioner committed two sins. The first is that on one occasion he made an optimistic statement as to stock of a new company without disclosing there was no information available as to whether it had operating profits or losses at the time.[1] When Kahn

---

1. We cannot agree with the Commission that a lack of information as to present operating profits or losses is equivalent to a complete lack of "financial information."

made the statements complained of only one brochure had been published and no accounting figures were yet available. Clearly, a straightforward affirmance on these grounds would establish an extraordinarily broad *per se* rule. Upon remand, the Commission, in accordance with the statute, should state which, if any, of the surrounding circumstances made this statement "misleading." Furthermore, the Commission's finding of a lack of an adequate basis for faith in Sports stock at the time of Kahn's statement should be spelled out. The only specific fact in this lengthy record yet brought to the Court's attention is that Sports had operating losses at the end of the first year. But no accounting figures were available when Kahn made the challenged statement. As in Berko, an analysis of Sports' overall financial condition at the time must be made. Finally, the Commission should indicate the extent to which it believes Kahn's specialization in Sports stock or his knowledge that the customer had read some material from MacRobbins created or increased the duty to disclose. If this latter factor is considered important, a finding should be made, with reasons stated, as to whether the first brochure was misleading. This is particularly necessary since this was apparently the only one published at the pertinent time and the opinion merely quotes certain portions and then leaves it without an explicit finding. It is not the form so much as the substance that is troubling, however, for no part of this lengthy record has been brought to our attention which challenges in the slightest the truthfulness of the quoted passages.

The second aspect of the Commission's findings relates to Kahn's projection of earnings. The vice found here is Kahn's failure to state which other companies he was talking about, in what ways they were different, and "other facts necessary to make the comparison fair." It then rejected Kahn's defense that he had relied on certain literature in good faith solely on the grounds that the literature had not been published at the time. The

implication is left, however, that such literature could "constitute a basis for excusing his erroneous projection." This is doubly confusing. First, counsel for the Commission have relied in this Court upon certain SEC decisions which apparently hold comparisons between new and old companies, even when named, *per se* misleading and reject the defense of reliance upon ˜unverified literature. American Republic Investors, Inc., 37 S.E.C. 287; Whitehall Corp., 38 S.E.C. 259 (1958). But the Commission itself did not rely upon these cases or their holdings in framing its theory against Kahn. Second, the right to rely upon information secured from the employer would seem to be a critical issue in applying the statute to salesmen in "boiler room" operations. Indeed, in Berko this right is implicitly rejected. In Kahn, it is implicitly upheld, albeit held inapplicable on the facts. Upon remand, the Commission should clarify its views as to why Kahn's statement is misleading. It should deal with the issues outlined above and any others the Commission considers relevant.

We will remand the case to the Commission to the end that it may take such further action, including those which we have indicated, as may be required.

Remanded.

CLARK, Circuit Judge (concurring in the result).

With considerable doubt and not a little reluctance I have at length felt constrained to concur in the remand to the Commission, although for somewhat different reasons from those expressed by my brothers. In fact their directions for re-examination of the case seem to me vague and unoriented. Generally speaking, I find remand for perfecting findings rather unprofitable and valueless as aid to ultimate decision; a classic case is our remand to the ICC which led to Judge Frank's celebrated "woosh-woosh" dissent in Old Colony Bondholders v. New York, N. H. & H. R. Co., 2 Cir., 161 F.2d 413, 450, certiorari denied 331 U.S. 850, 67 S.Ct. 1754, 91 L.Ed. 1865. And the

findings do not seem to me as vague as my brothers depict them; admittedly they show a "boiler room" blitz in stock sales promotion which was improper and a general participation in the sales effort by Kahn here and by Berko in the companion case. In substance their defense is lack of knowledge of what they were actually doing, or "I didn't know the gun was loaded." I do not care to support that defense or to throw obstacles in the way of the very necessary policing which the SEC should do and here is attempting of improper stock sales promotion. I believe they deserve the quite moderate punishment or reprimand they received. Finally I am concerned by the statement that our authority to affirm is here more limited than upon district court review; as shown by the author cited, 2 Davis, Administrative Law Treatise §§ 16.05, 16.12 (1958), this is an oversimplification of a complex problem with extensive ramifications.

My trouble is somewhat different; it is more to perceive what theory of law, or which of several possible ones, the Commission is applying. And I think it will be helpful not only to reviewing courts, but to the Commission itself, if it clarifies the position it here takes and doubtless will need to take in other similar cases. Basically the question is the extent to which it would press the conclusion of fraud which we supported in Charles Hughes & Co. v. S.E.C., 2 Cir., 139 F.2d 434, certiorari denied 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077. The Commission is relying on the so-called "shingle" theory to establish statutory fraud. The essence of this theory is that in certain circumstances one who sells securities to the public—who hangs out his shingle— implicitly warrants the soundness of statements of stock value, estimates of a firm's earnings potential, and the like. When such a person conceals known information inconsistent with this "implicit warranty of soundness" he has omitted a material fact without which

the statements made would be misleading. See 3 Loss, Securities Regulation 1490 (2d Ed. 1961). One element of this warranty, the Commission held below, is that all such statements, or at least highly optimistic ones, have an "adequate basis." If the salesman makes statements, knowing they had no adequate basis, or if he is "grossly careless or indifferent to the existence of an adequate basis" for his statements, then he has violated the anti-fraud provisions of the securities laws, principally § 17(a) (2) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (2).

My difficulty here is not with this theory of the law, or necessarily with its application to these circumstances, but with the fact that, while the record presents a diversity of possible rules of law governing this situation, the Commission has not clearly indicated which we are to rely on for purposes of review. In oral argument counsel for the Commission pointed out that the fact that these were "boiler room" operations should be considered in review of this case, suggesting that the obligations imposed by the "shingle" theory apply here because of the special circumstances of this type of operation. Yet the opinion below does not connect Kahn explicitly with any of the "boiler room" activities; the Commission's findings do not even state that Kahn's customer had received one of MacRobbins' brochures, even though the record suggests that he did. Thus I agree with the remand, not because otherwise we would establish a *per se* rule, but because we cannot tell what rule—*per se* or otherwise—we are called upon to review. Congress has given the Commission a broad, though not limitless, grant of authority to interpret and apply the statutes under which it operates. Before we can assess the validity of the Commission's interpretation of the statute, we should know precisely what that interpretation is. Compare S.E.C. v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626.