**Irwin BERKO, Petitioner,**

v.

**SECURITIES AND EXCHANGE COM-
MISSION, Respondent.**

No. 56, Docket 26904.

United States Court of Appeals
Second Circuit.

Argued Oct. 30, 1961.

Decided Dec. 7, 1961.

Robert J. Ward (of Aranow, Brodsky, Bohlinger, Einhorn & Dann), New York City (William M. Kaplan and I. Stephen Rabin, of Aranow, Brodsky, Bohlinger, Einhorn & Dann, and Arthur Gerwin, New York City, on the brief), for petitioner.

Allan F. Conwill, Securities and Exchange Commission, Washington, D. C. (Peter A. Dammann, Gen. Counsel, David Ferber, Asst. Gen. Counsel, Sidney D. Goldberg, Sp. Counsel, and Faith Colish, Atty., Securities and Exchange Commission, Washington, D. C., on the brief), for respondent.

Before CLARK, FRIENDLY and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

This case arises on a petition from an order of the Securities and Exchange Commission. The Commission instituted proceedings under 15 U.S.C.A. §§ 78o(b) and 78o–3(b) (4) to determine whether the broker-dealer registration of Mac-Robbins & Co. Inc. should be revoked and whether certain persons, including petitioner, were each the cause of a revocation order if entered. The brokerage firm and its principal officer entered into a stipulation admitting violations of the registration requirements of the Securities Act of 1933, and the anti-fraud provisions of that Act and the Securities Exchange Act of 1934. Its registration was revoked. The Commission also took evidence and found that nine salesmen, including petitioner, were a cause of revocation.[1]

MacRobbins, Inc. was a co-underwriter of an issue of stock of Sports Arenas, Inc. (Sports), a corporation engaged in the operation of bowling alleys. Before and after the initial stock issue had been sold out, MacRobbins' principal business

---

1. The order in question would operate to prevent any broker or dealer who hired petitioner without the Commission's ap-proval from being a member of a national securities association. 15 U.S.C.A. § 78o–3(b) (4).

was trading in Sports' shares. The sales method employed involved sending brochures to an apparently selected list of customers who were encouraged to inquire further. If a recipient of a brochure showed any interest in the stock, one of the firms' salesmen would contact him and attempt to sell some stock. The Commission found that one, and perhaps both, of the brochures described in its opinion were misleading.[2] At the time, Sports, a new company, was suffering initial operating losses. It further found that nine of the salesmen made misleading statements relating to Sports stock.

The Commission's only findings specifically directed to petitioner Berko were that he "represented to a customer who purchased 60 shares of Sports stock in October 1958 at $7.00 per share that there was a good possibility that the price of the stock would rise as high as $15.00 within a year." The Commission further stated, in reference to the activities of the salesmen as a group, "The highly optimistic statements * * * implied that there was an adequate and reasonable basis for them. However, no such basis existed. Financial statements which showed the losses sustained by Sports were available, prior to the representations made * * * yet all of the salesmen * * * disclaimed any knowledge of Sports' financial condition, apparently made no effort to ascertain it and, despite their asserted lack of such vital information, neither withheld nor qualified their optimistic statements." The Commission's ultimate conclusion was, "[T]he individuals who participated in the violations either knew there was no adequate basis for the optimistic statements made and that their other representations were false or misleading, or they were grossly careless or indifferent as to the existence of an adequate basis for their statements or as to the truth or adequacy of the material facts they represented."[3]

The SEC's findings boil down to the following propositions. Berko predicted Sports would rise to 15 within a year. There was no adequate basis for this statement because Sports, a firm in business for approximately one year, was suffering initial operating losses. Petitioner should have known of the losses and disclosed them. The SEC concedes Berko's statement was a reasonably accurate prediction of what actually happened, although it contends there was no basis for it when made. It further concedes Sports has become a profitable organization.

Counsel for the Commission has argued before us that we should take into account the whole context of the "boiler room" operation, e. g. specialization in one stock, use of misleading brochures, a large volume of sales over the long-distance telephone, and lack of knowledge or disclosure of the real condition of the company. Indeed, it was stated that the Commission is particularly interested in this case because it is seeking more effective means of dealing with "boiler rooms." As the Commission stated in its opinion, "We have had occasion to condemn the technique of using numerous salesmen to sell a large volume of shares of one issuer by long-distance telephone without any knowledge of the financial condition of the issuer or any effort to obtain such information, and without disclosure to prospective purchasers of adverse financial information and the absence of any reasonable basis for the optimistic statements and predictions made." We applaud the efforts of the Commission in seeking better means of dealing with "boiler room" operations and agree fully with the thrust of the

---

2. The Commission's finding here is highly ambiguous. Although it quotes from several of the brochures, the agency's opinion explicitly found only the final one to be misleading.

3. The basic statutory provision relied upon, 15 U.S.C.A. § 77q(a) (2), prohibits the obtaining of money or property "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

last-quoted statement. This statement would appear to be sufficient to condemn a brokerage firm or those in control.

The present case, however, involves the liability of an employee of the firm who exercised no control over its operations and apparently did not engage in a continuous course of fraudulent conduct. Moreover, the findings and apparent legal theory of the Commission itself are not restricted to "boiler room" operations. The only finding is that Berko made the prediction. The only legal theory is that this statement should have been accompanied by disclosure of the losses and that it lacked an adequate basis. In neither aspect do we find an element peculiar to so-called "boiler room" operations.

Moreover, although the Commission has characterized petitioner as lacking knowledge of Sport's "financial condition" and has found his statement to be without an "adequate basis," it points only to his ignorance of the initial operating losses to support its finding. But a company's "financial condition" and the existence of an "adequate basis" for optimistic statements about it clearly depend upon many factors other than initial operating losses. The importance of the losses themselves will vary with the capital structure, the relative size of the losses, their causes, the programs of expansion undertaken by the new company, the quality of its management, and many other factors too numerous to mention. Although the SEC is far better equipped for such analysis than this Court, it failed to make any findings along these lines. Although it was quick to find petitioner lacked knowledge of Sports' "financial condition" and had no "adequate basis" for his statement, the Commission eschewed any investigation

or discussion of the information which Berko had and which he relied on.

Were we reviewing a decision of a lower court sitting without a jury, we could make additional findings and affirm on grounds not relied upon below. Westley v. Southern Railway Co., 250 F.2d 188 (4 Cir. 1957). But we enjoy no such freedom when reviewing actions of an administrative agency. Davis, Administrative Law, §§ 16.05, 16.12. As the Supreme Court said in SEC v. Chenery, "For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). The findings and legal theory of the Commission here lack that clarity and expression of purpose as derived through administrative experience necessary when issues not yet passed upon by any court are presented.[4] Although the agency has stated in argument this case is important in terms of its campaign against "boiler rooms," affirmance of its findings and reasoning would establish a rule applicable to all sales of securities. We may presume the Commission is not attempting to fashion such a *per se* rule, because if for no other reason, the statute specifies the misleading nature of any statement is to be determined in the light of all the circumstances. But the Commission has not stated what surrounding circumstances persuaded it to rule this way.[5] We should not and cannot resolve these questions without more complete findings and a clearer indication of the precise basis for its decision. Because this case raises substantial questions, and we believe clarification necessary, we must remand. District 65, Retail Union v. N. L. R. B., 294 F.2d 364 (3 Cir. 1961).

4. The principal case relied upon by the Commission is Charles Hughes & Co. v. S. E. C., 139 F.2d 434 (2 Cir. 1943), cert. denied, 321 U.S. 786, 64 S.Ct. 781, 88 L. Ed. 1077 (1944). We held there it was a violation for a broker to fail to disclose to his customers that he was selling them stock at prices substantially above their market value.

5. See note 2, supra (p. 117).

In particular, the Commission should state to what extent, if any, Berko's specialization in Sports stock created a greater duty to investigate and to disclose than might be imposed under other circumstances. It should also clarify the nature of these complementary duties upon a salesman like Berko when he knows the potential customer has read a misleading brochure sent by his employer. If this circumstance is found to be relevant, a finding of fact should be made as to whether Berko had such knowledge. Finally, the Commission should clarify its position as to Berko's right to rely on information secured from his employer. May he accept such information at face value or must he, regardless of his employer's wishes, make an independent investigation or does this too vary with the circumstances? While the Commission's opinion seems implicitly to compel investigation, one portion implies quite the contrary.[6] Finally, the tone of the opinion is to the effect that Sports was a bad risk indeed, but it points only to the initial operating losses. Further analysis of Sports' condition at the time is imperative.[7] The Commission is not limited to these issues, but may raise any other factor it believes relevant. Basically, its goal should be clarification of the legal duties imposed on salesmen involved in operations such as MacRobbins, Inc. As to the contentions advanced by the parties before this Court, we express no view.

We will remand the case to the Commission to the end that it may take such further action, including those which we have indicated, as may be required.

Remanded.

CLARK, Circuit Judge (concurring in the result).

As in the companion case of Kahn v. S.E.C., 2 Cir., 297 F.2d 112, decided this day, I am concurring in the remand because of my need for clarification of the governing principles of law upon which the Commission is actually proceeding.

6. In footnote 14, in its main opinion, the Commission seems to imply salesman Kahn, petitioner in a companion case before us, could rely upon such information. This implication crops up again in its supplemental order and opinion as to Kahn.

7. This line of inquiry should include, but not be limited to, an explanation of the relation of the information stated in footnote 7 of the Commission's opinion to the material in the corresponding text. If the losses stated in the text related for the most part to arenas not yet in operation, how significant are these losses in terms of the company's overall financial condition or its future prospects? There should also be some explanation of the "allocations for management services." The Court was unsuccessful in obtaining this information at oral argument.