Irwin BERKO, Petitioner,

v.

SECURITIES AND EXCHANGE COM-
MISSION, Respondent.

No. 204, Docket 27774.

United States Court of Appeals

Second Circuit.

Argued Jan. 8, 1963.

Decided April 9, 1963.

Robert J. Ward, New York City (Aranow, Brodsky, Bohlinger, Einhorn & Dann, New York City, on the brief), for petitioner.

Peter A. Dammann, Gen. Counsel, Securities and Exchange Commission, Washington, D. C. (David Ferber, Assoc. Gen. Counsel, George P. Michaely, Jr., Sp. Counsel, and Donald R. Jolliffe, Atty., Securities and Exchange Commission, Washington, D. C., on the brief), for respondent.

Before CLARK, FRIENDLY and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

This is a petition for review of an order of the Securities and Exchange Commission entered pursuant to a remand by this court of a former order of the Commission. Berko v. S. E. C., 297 F.2d 116 (2 Cir., 1961). The original petition sought review of a Commission order of February 6, 1961, which found that Irwin Berko, a salesman, was a cause of revocation of the broker and dealer registration of his employer, Mac-Robbins & Co., Inc.

The Commission's original order revoking the registration of MacRobbins & Co. and finding petitioner a cause thereof was entered pursuant to Sections 15(b) and 15A(b)(4) of the Securities Exchange Act of 1934, as amended. 15 U.S.C.A. §§ 78o(b) and 78o–3(b) (4). In its Findings and Opinion the Commission held, on the basis of the record, that MacRobbins & Co. and nine of its salesmen, including petitioner, had violated the antifraud provisions of Section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a); of Sections 10(b) and 15(c) (1) of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j (b) and 78o(c) (1); and of Rules 10b–5 and 15c1–2 thereunder, 17 C.F.R. 240.-10b–5 and 15c1–2, in the offer and sale of the stock of Sports Arenas, Inc., a Delaware corporation.

On the original petition for review, we found that the Commission's findings and legal theory lacked "that clarity and expression of purpose as derived through administrative experience necessary when issues not yet passed upon by any court are presented." 297 F.2d at 118. Accordingly, we remanded the case to the Commission, requesting "more complete findings and a clearer indication of the precise basis for its decision." [1] Ibid.

1. We said in that opinion:

"In particular, the Commission should state to what extent, if any, Berko's specialization in Sports stock created a greater duty to investigate and to disclose than might be imposed under other circumstances. It should also clarify the nature of these complementary duties upon a salesman like Berko when he knows the potential customer has read a misleading brochure sent by his employer. If this circumstance is found to be relevant, a finding of fact should be made

as to whether Berko had such knowledge. Finally, the Commission should clarify its position as to Berko's right to rely on information secured from his employer. May he accept such information at face value or must he, regardless of his employer's wishes, make an independent investigation or does this too vary with the circumstances? While the Commission's opinion seems implicitly to compel investigation, one portion implies quite the contrary. Finally, the tone of the opinion is to the effect that Sports was a bad

Without holding further hearings, the Commission filed a new opinion in which it reaffirmed its previous finding that petitioner was a cause of revocation of his employer's broker-dealer registration.[2] This petition for review followed. 15 U. S.C.A. § 78y.

In its opinion on remand, the Commission reviews the applicable law and again emphasizes the evils inherent in be no question that MacRobbins was operating a "boiler-room" in plain violation of the statute and that there was ample evidence to support that portion of the order revoking its broker-dealer registration; indeed, the registrant had entered into a stipulation consenting to the revocation. MacRobbins had set up the operation for the principal and specialized purpose of selling a single stock, that of Sports Arenas, Inc. At least two brochures, both of which were properly found to be deceptive and misleading, were widely distributed through the mails. Ten salesmen were employed to make telephone calls to and receive telephone calls from prospective customers and to urge the purchase of Sports Arenas stock. A result was that more than 100,000 shares were sold between October 1957 and November 1958. The operation of MacRobbins was also characterized by a lack of knowledge or failure to disclose the true financial condition of Sports Arenas. As we said in our earlier opinion, "We applaud the efforts of the Commission in seeking better means of dealing with 'boiler room' operations. * * *" 297 F.2d at 117.

The question we face here, however, is a somewhat different one. It is whether there is sufficient evidence in the record to support the Commission's finding that the petitioner Berko was a "cause" of the revocation of MacRobbins' registration within the meaning of Section 15A (b) (4) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o–3(b) (4). We have examined the record carefully and concluded that the evidence is sufficient to support the Commission's order. The order is therefore affirmed.

risk indeed, but it points only to the initial operating losses. Further analysis of Sports' condition at the time is imperative. The Commission is not limited to these issues, but may raise any other factor it believes relevant. Basically, its goal should be clarification of the legal duties imposed on salesmen involved in operations such as MacRobbins, Inc. As to the contentions advanced by the parties before this Court, we express no view. "We will remand the case to the Commission to the end that it may take such further action, including those which we have indicated, as may be required." 297 F.2d at 119.

2. At the same time that we remanded Berko to the Commission, we also remanded a companion order of the Commission finding Arnold L. Kahn to be a cause of the revocation of MacRobbins' registration. Kahn v. S. E. C., 297 F.2d 112 (2 Cir., 1961). On remand the Commission ordered its previous findings as to both men in a single, consolidated opinion. Kahn has not sought review of the Commission's present order.

"boiler-room" operations.[3] There can

3. In its opinion on remand, the Commission sums up such operations as follows:

"These boiler-room operations, relying for the most part on oral representation, subject the requirements of fair dealing to their greatest test and the enforcement of the statutory prohibitions against fraud to grave difficulties. The assault on the investors' dollars is frequently initiated by sales brochures artfully contrived to avoid express falsehood; instead, nuances and implications are used in presenting information of a general nature to create an optimistic picture and to obscure, conceal or distort essential or material information concerning the specific security offered. This is soon followed by telephone solicitations by skilled salemen recruited solely for their ability to execute effectively a 'hard sell' campaign. The optimistic picture presented by the brochures is heightened by oral projections of specific per share earnings, predictions of market price rises and other happy prospects wholly lacking an adequate basis. At no time is disclosure made of any known or reasonably ascertainable adverse information. Nor is any word of caution given as to the risks involved. When the conversation is completed and the transaction effected, the customer is left with rosy expectations of gain without risk deliberately and dishonestly created by these high-pressure selling techniques."

An understanding of the relevant statutory background is necessary to decision in this case. Section 15(a) of the Securities Exchange Act of 1934 requires a "broker or dealer" to be registered. 15 U.S.C.A. § 78o(a). Section 15(b) provides for denying or revoking such registration if, *inter alia*, the broker or dealer "(D) has willfully violated any provision of the Securities Act of 1933, or of this chapter, or of any rule or regulation thereunder," and revocation is in the public interest. 15 U.S.C.A. § 78o(b). These provisions were the basis for the revocation of MacRobbins' registration. Since Berko was not a broker or dealer, there was no requirement that he be registered. Section 15(b) also provides that the Commission may deny or revoke the registration of a broker or dealer if "any person directly or indirectly controlling or controlled by such broker or dealer, whether prior or subsequent to becoming such," falls within subsection (D), quoted above, an issue that would not arise in the present case unless or until Berko seeks employment with a new broker or dealer. Moreover, Section 15A(b)(4), 15 U.S.C.A. § 78o–3(b)(4), provides that an association of securities dealers must adhere to a rule that no broker or dealer shall be admitted to or continued in membership if "any person directly or indirectly * * * controlled by such broker or dealer * * * (C) by his conduct while employed by, acting for, or directly or indirectly controlling or controlled by, a broker or dealer, was a cause of any suspension, expulsion, or order of the character described in clause (A) or (B)," which includes orders revoking registration pursuant to Section 15. In order to give some measure of assurance to subsequent prospective employers, the Commission affords to all persons, such as salesmen, suspected of being a "cause" of revocation the opportunity to participate in registration revocation proceedings. Cf. Wallach v. S. E. C., 92 U.S.App.D.C. 108, 202 F.2d 462 (1953). In the present case, Berko elected to appear and participate in the proceedings. The result of such proceedings is often, as it was in Berko's case, a declaratory-type order that a salesman has been a "cause" of the revocation of the broker's registration, an order which in general will have the effect of preventing any other broker from employing the salesman without the prior approval of the Commission. See 2 Loss Securities Regulation 1314–23, 1384–85 (2 ed. 1961).

The facts of Berko's actions, as they are set out in the record, must be judged, therefore, against the statutory requirement of "cause." Surprisingly, the meaning of the word "cause" as it is used in the statute has not been the subject of detailed judicial construction. In R. H. Johnson & Co. v. S. E. C., 198 F. 2d 690, 696 (2 Cir.), cert. denied, 344 U. S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952), this court, speaking through Judge Frank, rejected the contention that " 'cause' must always be interpreted to mean 'an immediate or inducing cause'." [4] But neither that opinion nor the Commission nor common sense suggests that the statutory requirement should be deemed to have been met by a demonstration merely that the salesman's conduct was to some degree a factor in the revocation

4. It is to be noted, however, that the factual situation to which this court spoke in Johnson was somewhat different from that in the present case. Johnson was the dominant partner in a company in which he had complete control of all persons in the organization, including the other partners; he totally failed to exercise adequate supervision over these persons. It was apparently his contention before this court that he could not be found a "cause" of the actions of unsupervised personnel. The court met that contention by saying, "If Johnson's contention were sound, then, in order to circumvent those principles [set forth in the statute], a person controlling a firm would merely have to arrange to leave wholly unsupervised its employees who deal with customers. We think Johnson's irresponsible behavior with respect to supervision amounted to such recklessness as to justify the finding that he was a 'cause' of the firm's expulsion." 198 F.2d at 697.

of his employer's registration. More than this is required.[5] The determination of the point at which the balance is to be struck must be made on a case-by-case basis because, as a leading authority in this area has pointed out, the "relevant factors [in determining 'cause'], it would seem, are not too different from those which go to 'public interest' under § 15(b)." 2 Loss, Securities Regulation 1385 (2d ed. 1961). In short, the determination calls for an exercise of expertise, discretion, and policy selection on the part of the Commission.

Berko was employed by MacRobbins from June 1958 to December 1958; this was the first time that he had ever been employed either in the securities field or as a salesman on commission. Upon starting with MacRobbins he was given "some brochures" to read. In reply to a question, "You studied the green folders, the two of them, that we have in evidence and one or two articles—," Berko replied, "Yes." He also said that he had been given literature to mail out to people and that "I did mail out some literature, yes, sir." He denied having any knowledge that Sports Arenas was operating at a loss and said that during the time he was selling its stock, he was awaiting the annual financial statement of the corporation; he therefore necessarily admitted that he never was in a position to tell a customer that Sports Arenas was in fact operating at a loss.

One witness, Irving Thurm, testified that in 1958 he received literature from MacRobbins recommending Sports Arenas stock and that he telephoned Berko because "he had known somebody who had bought Sports Arena who had known Mr. Berko personally, and—feeling that if anyone was going to handle it, Mr.

Berko would do just as well as anyone else." Since Thurm already knew of Sports Arenas from his friend, his conversation with Berko centered on the price of the stock. Berko represented to Thurm, who was buying the stock at $7 per share, that there was a good possibility that the price would rise to as high as $15 within a year. Thurm subsequently bought 60 shares.

■■ Upon this evidence the Commission found that Berko was "chargeable with knowledge of the contents of the circular and of the brochures sent to prospective customers" and that "willful participation by [Berko] in such a fraudulent sales campaign constituted a course of business which operated as a fraud and deceit on investors in violation of the anti-fraud provisions of the Securities Act. * * *" In reviewing these findings, it is important to remember that the Commission is charged with the duty of enforcing the statute in the "public interest", a mandate which necessarily "gives the Commission broad discretion", 2 Loss, Securities Regulation 1323 (2d ed.1961), and that its orders are intended to be remedial rather than penal, a result of the fact that the "design of the statute is to protect investors" and the general public in this specialized field. Securities Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 124, 73 S. Ct. 981, 97 L.Ed. 1494 (1953); Associated Sec. Corp. v. S. E. C., 283 F.2d 773, 775 (10 Cir., 1960); Pierce v. S. E. C., 239 F.2d 160, 163 (9 Cir., 1956); Wright v. S. E. C., 112 F.2d 89, 94 (2 Cir., 1940). As another Court of Appeals had occasion to say in Associated Sec. Corp. v. S. E. C., 293 F.2d 738, 741 (10 Cir., 1961), in rejecting a contention that the Commission did not demonstrate that a regis-

5. The Commission's ruling expressly states:
"We consider that our findings and conclusions as to Kahn and Berko involve neither a novel nor *per se* rule with respect to representations by securities salesmen. We do believe, however, that participation in a high-pressure sales ef- fort involving the use of misleading sales materials, and the making of extravagant predictions and projections, without basis in factual information and without adequate disclosure of material adverse information, is inconsistent with the duty of brokers, dealers, and their salesmen to deal fairly with their customers."

tration revocation was in the "public interest":

> "The balancing of private detriment against public harm requires the fair and proper exercise by the Commission of its discretionary powers. The evaluation of facts and the exercise of judgment for the protection of investors dealing in over-the-counter securities is a function assigned by Congress to the Commission rather than the courts and the exercise by the Commission of its discretionary powers will not be upset by the courts except for cogent reasons."

This means, as courts have many times said, that "it is the Commission, not the courts, which must be satisfied that the public interest will be served * * *. And the fact that we might not have made the same determination on the same facts does not warrant a substitution of judicial for administrative discretion since Congress has confided the problem to the latter." Federal Communications Commission v. WOKO, Inc., 329 U.S. 223, 229, 67 S.Ct. 213, 216, 91 L.Ed. 204 (1946).

■ The findings of the Commission are supported by substantial evidence and its order is based upon a fully permissible view of how best the "public interest" will be served. Berko worked in an office which was plainly established to be a "boiler-room" and which Berko knew to be a "boiler-room." He worked with two other salesmen in an office space having six telephones, as part of a sales operation which relied almost entirely upon long-distance telephone solicitation for its success. He studied, mailed out, and utilized brochures which he should have known and, on proper study, could have determined were deceptive and misleading. He did not know and hence was unable to tell prospective customers that Sports Arenas, Inc., was operating at a loss. Finally, although he sold some other stocks, Berko knew that Sports Arenas was the principal stock that Mac-Robbins was selling during the six-month period that he worked for the company.

■ These facts fully justified the Commission—in seeking to protect "the investing and usually naive public", Norris & Hirshberg, Inc. v. S. E. C., 85 U.S. App.D.C. 268, 177 F.2d 228, 233 (1949), and "those who lack business acumen", United States v. Monjar, 47 F.Supp. 421, 425 (D.Del.1942)—in holding Berko, a "boiler-room" salesman, chargeable with knowledge of the contents of the brochures and with responsibility for allowing customers to rely upon them. Cf. Sherwood v. United States, 300 F.2d 603 (5 Cir.), cert. denied, 371 U.S. 838, 83 S.Ct. 65, 9 L.Ed.2d 74 (1962); United States v. Tellier, 255 F.2d 441 (2 Cir.), cert. denied, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958). The Commission acted well within its mandate in concluding that the "public interest" requires that a salesman working out of a "boiler-room" be held to a higher duty to prospective customers than a salesman working out of a legitimate sales operation, and in concluding that a "boiler-room" salesman does not meet his obligation when he has no knowledge other than opinions and brochures furnished by the broker, "without any checking, investigation, or determination of the correctness of the same before putting them out to the public." S. E. C. v. Macon, 28 F.Supp. 127, 129 (D.Colo.1939). As the Commission appropriately said in its opinion, "Whatever may be a salesman's obligation of inquiry, or his right to rely on information provided by his employer, where securities of an established issuer are being recommended to customers by a broker-dealer who is not engaged in misleading and deceptive high-pressure selling practices, * * * there can be little, if any, justification for a claim of reliance on literature furnished by an employer who is engaged in a fraudulent sales campaign." This is an entirely proper and indeed salutary principle for the Commission to employ in coping with

the problems presented by "boiler-room" operations.[6]

That Berko failed to meet the higher duty set forth in this principle has already been made clear. With knowledge of the wide circulation of the misleading brochures mailed by him and others to prospective customers and without adequate knowledge of the financial condition of Sports Arenas, Inc., including the fact disclosed by the nine and eleven months financial statements already available at the time of his conversation with Thurm, that it was operating at a loss, he sold the stock "to just about everybody." Moreover, at a time when the stock of Sports Arenas, Inc., was selling for $7 per share, he represented to Thurm that there was a good possibility that it would rise to as high as $15 per share within a year. No adequate basis existed, as Berko should have known, for such an optimistic representation. Although the opinion of the Commission neither mentions nor relies on the fact, the record reveals that Berko earned approximately $11,000 from his sales activities during the six-month period that he was employed by MacRobbins.[7]

 Finally, we need only note in passing that when the Commission's finding of "cause" with respect to a salesman is supported by substantial evidence in the record, as it is here, the fact that the salesman's clients were not misled and indeed may even have profited from his actions is legally irrelevant. Hughes v. S. E. C., 85 U.S.App.D.C. 56, 174 F. 2d 969, 974 (1949). The Commission's duty is to enforce the remedial and preventive terms of the statute in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury.

Affirmed.

---

**6.** The Commission's opinion and analysis of the facts makes clear that it is not attempting to fashion a *per se* rule to be applied indiscriminately in all "boiler-room" cases. This is substantiated by the fact that although the Commission made findings of cause against nine salesmen, it dismissed the proceedings against a tenth.

**7.** In answer to questioning at the hearing, Berko said that he had sold Sports Arenas stock "to just about everybody."