In the Matter of AMERICAN TRAILER RENTALS COMPANY.

SECURITIES AND EXCHANGE COMMISSION, Appellant,

v.

AMERICAN TRAILER RENTALS COMPANY, Debtor-Appellee.

Nos. 7392–7474.

United States Court of Appeals Tenth Circuit.

Dec. 9, 1963.

David Ferber, Associate General Counsel, Securities and Exchange Commission, Washington, D. C. (Philip A. Loomis, Jr., General Counsel, Allan R. Roth, Attorney, Thomas B. Hart, Regional Administrator, J. Kirk Windle, Special Counsel, and William D. Scheid, Attorney, Securities and Exchange Commission, on the brief), for appellant.

Gilbert C. Maxwell, Denver, Colo. (Arthur W. Burke, Jr., and Benjamin E. Sweet, Denver, Colo., on the brief), for debtor-appellee.

Before MURRAH, Chief Judge, and PHILLIPS and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

This is a consolidated appeal from two orders of the United States District Court for the District of Colorado, growing out of an arrangement proceeding under Chapter XI of the Bankruptcy Act, (11 U.S.C. § 701 et seq.), in which American Trailer Rentals Company is the debtor.[1] Securities and Exchange Commission is the appellant in both instances. The S.E.C. contends that the District Court erred in denying its motion to intervene and to dismiss the Chapter XI petition unless the proceedings were continued under Chapter X of the Bankruptcy Act. (11 U.S.C. § 501 et seq.) It is urged that the relief afforded by Chapter XI is inadequate because the circumstances disclosed by the record indicate the necessity of an independent investigation of the proposed new management and the methods used in soliciting approval of the plan, which can be accomplished only in a Chapter X proceeding.

The debtor is a Colorado corporation organized in 1958 to engage in the business of renting automobile trailers to the general public for local and cross-country trips. Originally, the trailer rental system had been operated by a complex of inter-related corporations, of which the debtor was one. In 1961, the remaining corporations of the complex were merged into the debtor. Under the rental system as operated by debtor, trailers were sold to individuals and leased back to the debtor. These trailers are the ordinary, utility type, which may be attached to the rear of an automobile by means of a detachable bumper hitch furnished as part of the trailer equipment. The trailers were placed at gasoline service stations in several states, with individual station operators acting as rental agents for the debtor.[2]

Under the sale-and-lease-back contracts with the individual trailer owners, the debtor had agreed to a fixed return per year, based on the cost of the trailer. Three payment plans were used, (1) a guaranteed payment of 2% per month for 10 years, (2) a guaranteed payment of 3% per month for 5 years, and (3) a payment of 35% of the rental income less repairs. A majority of the agreements were for 2% per month for 10 years. The debtor, in its proposed arrangement, stated that these fixed payments, since unrelated to the actual earnings of the trailers, were the major cause of its financial difficulties.

When the petition was filed on December 20, 1962, the debtor stated its assets to be $685,608.82, and its liabilities $1,-

---

1. No. 7392 is an appeal from a denial of the Commission's application under Section 328 of the Bankruptcy Act, (11 U.S.C. § 728), to dismiss the debtor's petition under Chapter XI, on the ground that it should properly be a Chapter X proceeding.

   No. 7474 is an appeal from an order denying the Commission's motion to intervene in the Chapter XI proceedings to show a violation of Section 17 (fraud provisions) of the Securities Act of 1933, and confirming the arrangement as modified.

2. When the petition herein was filed, these agents, scattered throughout the country, numbered about 500.

367,890.66.[3] Its trailer network consisted of approximately 3,000 trailers, owned by about 1,200 individuals, and located throughout the country at the rental stations. Debtor's peak earnings had been $60,000 per month, but diminished to about $14,000 per month when this proceeding was instituted, and was down to $4,000 per month when the Commission's petition was filed. Considering the payments made under the leasing agreements as a return of capital, the trailer owners' remaining investment in the 3,000 trailers totaled $1,532,902.43.

The arrangement proposed, as modified, provides that the trailer owners would transfer title to their trailers in exchange for one share of stock in the newly created Capitol Leasing Corporation,[4] for each two dollars of their remaining investment in exchange for the title to the trailers, and forego their claims for past and future payments growing out of their leasing agreements. Persons who had paid in $200,677 for trailers which were never manufactured are to receive one share for each $2.00 paid.[5] The trailer rental system is to be assigned to Capitol Leasing in exchange for 107,100 shares. Unsecured creditors are to receive one share for each $3.50 of debt, except those unsecured creditors who are also officers and directors of the debtor, who are to be given one share for each $5.50 of debt. A $40,000 bank debt is to be assumed by the president of the debtor and he will receive one share for each $5.50 of the assumed obligation. The amount due the accountants is to be paid by individual officers and directors of the debtor as guarantors of debtor's note. The court expressed some objection to the initial arrangement, indicating that it did not appear to give the trailer owners a "fair shake." It was indicated that an acceptable plan should be one which resulted in the investors' control of the corporation, and noted that investors should perhaps get more than one share for each $2.00 of investment, while management should get less than one share for each $3.50 as was originally proposed. Following those comments, debtor submitted the amendments to the arrangement.

The Commission, in its motion under Section 328 of the Bankrutpcy Act, 11 U.S.C. § 728, to dismiss the Chapter XI proceedings, alleges that this is properly a Chapter X proceeding for three reasons[6]; first, that the debtor needs

3. Assets:

| | |
|---|---|
| $500,000.00 | rental network (intangible asset) |
| 173,196.07 | accounts receivable |
| 10,712.75 | furniture and equipment |
| 1,700.00 | vehicles and service equipment. |
| $685,608.82 | |

Liabilities:

| | |
|---|---|
| $ 5,611.58 | secured debt (chattel mtgs. on furniture, vehicles and service equipment) |
| 727,585.97 | executory contracts |
| 230,783.29 | accounts payable |
| 392,533.15 | notes payable |
| 6,691.97 | wages and commissions |
| 4,684.70 | taxes |
| $1,367,890.66 | |

(From Referee's Statement)

4. Capitol Leasing Corporation was formed on March 27, 1962, for the purpose of salvaging debtor's business. In May of that year, it commenced the public offering of its shares under the Regulation "A" Exemption, Securities Act of 1933, in exchange for cash or trailers. Only trailers were exchanged. On October 9, 1962, the S.E.C. stop-ordered the Regulation "A" offering on the grounds that the notification and offering circular were false and misleading. By that time, Capitol Leasing had acquired 299 trailers in exchange for 88,332 shares of its no-par stock, on the basis of one share for each $2.00 of investment. The only outstanding shares of Capitol's authorized 3,200,000 shares are those issued in exchange for the trailers prior to the stop-order.

5. This amount was paid to DeMar, Inc., a Nebraska corporation, which in 1960 was granted the exclusive right to manufacture trailers for the system, but has since been adjudicated a bankrupt.

6. Title 11 U.S.C. § 728, provides:
"The judge may, upon application of the Securities and Exchange Commission or any party in interest, and upon such notice to the debtor, to the Securities and Exchange Commission, and to such other persons as the judge may direct, if he

more than just an arrangement with its unsecured creditors; second, that the public investors need a disinterested trustee to protect and enforce their rights; and third, that Chapter X is required so that public investors will receive fair and equitable treatment. Since a petition for reorganization under Chapter X cannot be filed if "adequate relief would be obtainable by a debtor's petition under * * * chapter 11 * * *." (§ 146(2), Bankruptcy Act; 11 U.S.C. § 546(2)), the ultimate question is whether "adequate relief" is obtainable under the debtor's proposed arrangement.[7] Chapter XI does not require that the arrangement be "fair and equitable" as does Chapter X, (§ 221(2), Bankruptcy Act, 11 U.S.C. § 621(2), but only that it be feasible and in the best interest of the creditors. (§ 366(2), Bankruptcy Act, 11 U.S.C. § 766(2). The essential consid-

eration in the choice between Chapter X and XI is "the needs to be served." General Stores Corp. v. Shlensky, 350 U.S. 462, 466, 76 S.Ct. 516, 100 L.Ed. 550. Although Chapter XI is limited to arrangements dealing with unsecured debts, (§ 306(1) Bankruptcy Act, 11 U.S.C. § 706(1), the mere existence of public investors does not preclude the use of Chapter XI. General Stores Corp. v. Shlensky, supra; Grayson-Robinson Stores, Inc. v. Securities and Exchange Comm., 2 Cir., 320 F.2d 940. However, the more complex the debt structure and stock distribution, the greater the likelihood that the more complex procedures and safeguards of Chapter X are required. In re Transvision, 2 Cir., 217 F.2d 243, cert. denied 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744; Grayson-Robinson Stores, Inc. v. Securities and Exchange Comm., supra.[8]

finds that the proceedings should have been brought under chapter 10 of this title, enter an order dismissing the proceedings under this chapter, unless, within such time as the judge shall fix, the petition be amended to comply with the requirement of chapter 10 of this title for the filing of a debtor's petition or a creditors' petition under such chapter, be filed. Upon the filing of such amended petition, or of such creditors' petition, and the payment of such additional fees as may be required to comply with section 532 of this title, such amended petition or creditors' petition shall thereafter, for all purposes of chapter 10 of this title, be deemed to have been originally filed under such chapter."

7. The judge may, upon application and notice, dismiss a Chapter XI petition if he finds that the proceedings should have been brought under Chapter X. (§ 328, Bankruptcy Act, 11 U.S.C. § 728). This determination rests in his sound judicial discretion. General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550; Securities and Exchange Comm. v. Wilcox-Gay Corp., 6 Cir., 231 F.2d 859; In re Transvision, Inc., 2 Cir., 217 F.2d 243, cert. denied 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744.

8. Chapter X involves more complex procedures and safeguards than does Chapter XI. Chapter X requires the appointment of an independent trustee, the investigation of the activities and affairs

of the debtor, the plan or reorganization as formulated by the trustee, the S.E.C. participating in an advisory capacity, and the creditors' committees subject to judicial control and scrutiny. See, generally, Collier on Bankruptcy, 14th Ed. Vol. 6, §§ 0.08 [3], 0.09.

Although not expressly limited to the use of large corporations, Chapter X was, in effect, designed for the larger corporation with shares widely held by the public and with complicated debt structures. Securities and Exchange Comm. v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L. Ed. 1293. However, the choice between Chapter X and Chapter XI "is not determined solely by the size and capital structure of the company but, rather, by the nature of the interested parties, the necessity for independent investigation and control, the degree to which the debtor's activities must be readjusted." Collier on Bankruptcy, 14th Ed. Vol. 6, 1962 Supp. p. 7.

Factors appropriate to a Chapter XI arrangement include (1) simple corporate structure, (2) more than half the common stock held by management, (3) no interference with shareholder's rights, (4) acceptance of plan by unsecured creditors, (5) provision for priority creditors, (6) inability of corporation to bear expense of Chapter X proceeding. In re Lea Fabrics, 3 Cir., 272 F.2d 769; vacated as moot sub. nom. Securities and Exchange Comm. v. Lea Fabrics, Inc., 363

The Securities Exchange Commission argues that the arrangement as proposed by debtor is not really an arrangement at all, because if the plan is effected, the creditors of the debtor will be transformed into shareholders of the new corporation. The arrangement indicates that there is an aggregate remaining capital investment in the trailers of $1,532,902.43, which includes unpaid leasing fees in the amount of $710,597.53. Therefore, debtor states that trailer owners are to be compensated for their claims at the rate of one share for each $2.00 since the plan states that 766,451 shares of Capitol Leasing will be required to acquire title to all the trailers.[9] As the S.E.C. points out, there is no provision in the arrangement for trailer owners who do not choose to exchange their trailers for stock. In such cases the owners would retain title and the right of possession to their trailers.

The Commission also infers that debtor's remarks concerning a need for additional financing in order to salvage the business, and the implication that debtor's management may have engaged in some mishandling of corporate funds, supports the position that an independent trustee such as Chapter X provides, is necessary to assure fair and equitable treatment of public investors. The S.E.C. states that the most serious aspect of unfairness relates to the compensation of debtor's shareholders, as compared to the trailer owners. The S.E.C. argues that in the absence of a fresh contribution of capital, the stock-holders are entitled to receive nothing until the creditors (the trailer owners) are compensated in full, and that to do otherwise, as the plan contemplates, would be a violation of the absolute priority rule as laid down in Case v. Los Angeles Lumber Products Co., 308 U.S. 106,[10] 60 S.Ct. 1,

---

U.S. 417, 80 S.Ct. 1258, 4 L.Ed.2d 1515, Collier on Bankruptcy, 14th Ed. Vol. 6, 1962 Supp. p. 7.

9. Debtor assumes that the leasing fees previously paid trailer owners constituted a return of capital, if so, trailer owners would appear to receive compensation for their claims.

10. The 1952 Amendment of § 366(2), Bankruptcy Act, 11 U.S.C. § 766(2), (66 Stat. 433, P.L. 456, 82d Cong.2d Sess. § 35) eliminated from Chapter XI proceedings the "fair and equitable" provision, since in Securities and Exchange Comm. v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293, it was held that they were "words of art" having a well-understood meaning requiring an application of the principles of priority. The Court stated (310 U.S. 434, 452, 60 S.Ct. 1044, 1051–1052, 84 L.Ed. 1293) that:

"The phrase signifies that the plan or arrangement must conform to the rule of Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, [33 S.Ct. 554, 57 L.Ed. 931], which established the principle which we recently applied in the Los Angeles case, [Case v. Los Angeles Lumber Products Co., 308 U.S. 106 (60 S.Ct. 1, 84 L.Ed. 110), reh. denied 308 U.S. 637 (60 S.Ct. 258, 84 L.Ed. 529)] that in any plan of corporate reorganization unsecured creditors are entitled to priority over stockholders to the full extent of their

debts and that any scaling down of the claims of creditors without some fair compensating advantage to them which is prior to the rights of stockholders is inadmissible."

However, Chapter XI is derived from the composition procedure of the former § 12 of the Bankruptcy Act, in which the fair and equitable rule did not apply. The essence of Chapter XI is to permit the scaling down of debts, while allowing the debtor to keep his business and property. While this may be in the best interests of the creditors, it is contrary to the principles of priority expressed in the Boyd and Los Angeles Lumber cases. But the rule of those cases "cannot realistically be applied in a chapter XI * * * proceeding. Were it so applied, no individual debtor and, under chapter XI, no corporate debtor where the stock ownership is substantially identical with management could effectuate an arrangement except by payment of the claims of all creditors in full." U.S.Code Cong. & Adm.News, 82d Cong.2d Sess. Vol. 2, 1952, pp. 1981–2; Hanna & MacLachlan, The Bankruptcy Act Annotated, Foundation Press, 1957, pp. 246–7.

But see, Securities and Exchange Comm. v. Liberty Baking Corp., 2 Cir., 240 F.2d 511, cert. denied 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 723, which indicates that the "fair and equitable" rule may be applied in determining whether

84 L.Ed. 110, reh. denied 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529. But Section 366 states in part, that "Confirmation of an arrangement shall not be refused solely because the interest of a debtor, or if the debtor is a corporation, the interests of its stockholders or members will be preserved under the arrangement." In the legislative history of the 1952 amendments relating to Section 366, it is stated:

"The proposed amendment is designed to remove the fair and equitable provision, and by the paragraph added to each of the amended sections it is made clear that the rule of the Boyd and Los Angeles cases shall not be operative under those three chapters. [Chapters XI, XII, XIII]." U.S.Code Cong. and Adm. News, 82d Cong. 2d Sess. 1952, p. 1982.

S.E.C.'s position begs the question since it assumes that the arrangement has features which require the procedures of Chapter X. See Securities and Exchange Comm. v. Liberty Baking Corp., 2 Cir., 240 F.2d 511, cert. denied 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 723. However, since the granting of the motion rests in the discretion of the court, while we think this is a border-line case, it does not appear that the S.E.C. has shown that adequate relief is not obtainable in Chapter XI proceedings or that there has been an abuse of that discretion warranting reversal.

The second order appealed from relates to the confirmation of the arrangement as modified, and the denial of S.E.C.'s request to intervene to show violations of Section 17 (fraud provisions) of the Securities Act of 1933, (15 U.S.C. § 77q). While Securities issued under Chapter XI proceedings are exempt from Section 5 (registration) under the Securities Act of 1933, (15 U.S.C. § 77e), they are not exempt from Section 17.[11]

The S.E.C. alleges that at the time debtor was sending letters to the trailer owners urging them to exchange their trailers for shares of Capitol Leasing stock, the president of Capitol and the officers and directors of the debtor were withdrawing their trailers from debtor and were leasing them to another concern engaged in a similar business, and were also urging their relatives to do the same. This was not disclosed to the trailer owners, nor were trailer owners furnished information of Capitol's financial condition or its management. Trailer owners were not told of pending proceedings involving other stock fraud charges against Capitol.

The S.E.C. has on two prior occasions stopped the sale of securities by debtor and Capitol. The first was with regard to debtor in 1961 when the S.E.C. informed debtor that its trailer rental plans were investment contracts and, therefore, securities requiring registration. A registration statement was filed, but never became effective, and the issue was stop-ordered on the ground that the statement contained false and misleading statements and omitted certain material facts. The second involved the shares issued under the Regulation "A" exemption by Capitol Leasing Company in exchange for trailers. (See, footnote 4, supra.)

The S.E.C. also notes a number of other omissions of facts which it considers material if the investors are to be able to make an informed judgment on the arrangement. S.E.C. contends that the circumstances surrounding the

---

Chapter X or Chapter XI should be used. If the arrangement proposed to be accomplished under Chapter XI contains features which bring it within Chapter X, then an application of the "fair and equitable" rule is relevant. However, if the plan is properly within Chapter XI, it does not have to measure up to that standard. Collier on Bankruptcy, 14 Ed. Vol. 9, § 9.18 [2.1]. Collier states that "Since the legislative elimination of

the 'fair and equitable' test, use and reliance on these words, in view of their past interpretation, should not be continued. While several decisions have continued to refer to the 'fair and equitable' test, other and sound reasons for favoring Chapter X over Chapter XI were present in those cases." Id. at p. 306.

11. Section 3(a) (10), Securities Act of 1933, 15 U.S.C. § 77c(a) (10); Section

offering of Capitol Leasing stock under the arrangement is even more unfavorable and with less disclosure than the offering of Capitol under the Regulation "A" exemption which was stop-ordered.

■ Under Section 17(a), Securities Act of 1933, 15 U.S.C. § 77q(a), the failure to state the whole truth with regard to a security is equally as unlawful as statements of half-truths or deliberate falsehoods. Hughes v. Securities and Exchange Comm., 85 U.S.App.D.C. 56, 174 F.2d 969. It is the impression created by the statements which determines whether they are misleading. Kalwajtys v. Federal Trade Comm., 7 Cir., 237 F.2d 654, 65 A.L.R.2d 220, cert. denied 352 U.S. 1025, 77 S.Ct. 591, 1 L.Ed.2d 597; Securities and Exchange Comm. v. Macon, D.C.Colo., 28 F.Supp. 127. Cf. Berko v. Securities and Exchange Comm., 2 Cir., 316 F.2d 137. Section 17(a) is not limited to the common-law definition of fraud. Hughes v. Securities and Exchange Comm., supra; Norris & Hirshberg v. Securities and Exchange Comm., 85 U.S.App.D.C. 268, 177 F.2d 228, cert. denied 333 U.S. 867, 68 S.Ct. 788, 92 L. Ed. 1145; Loss, Securities Regulation, 1 Vol.Ed. p. 1435. From the authorities, it appears that if the stock involved here were not part of an arrangement, the disclosures made with regard to it would be clearly inadequate. No authority has been found which would indicate that recipients of stock issued in connection with an arrangement are not entitled to as much information as are those persons acquiring stock under ordinary conditions.

■ The S.E.C. points out in its brief that the simplest procedure would be for debtor to voluntarily provide the needed information [12], and, failing in that, the referee should have ordered that disclosure be made. We think this is a matter which the District Court can now handle. If it appears that, for the protection of those being solicited to accept the plan, additional information is necessary, the Court should so order. The Court has directed that the stock ratio for Capitol Leasing be such that the creditors will have control of the new corporation. In proceedings such as this, the District Court retains jurisdiction until the plan is carried out. §§ 368, 369, Bankruptcy Act, 11 U.S.C. §§ 768, 769. It may be that even without the additional information, the arrangement would still be in the "best interests of the creditors" (§ 366, 11 U.S.C. § 766), since that involves a comparison between what they will receive under the arrangement and what they would receive on liquidation. In re Village Men's Shops, Inc., D.C.Ind., 186 F.Supp. 125. The debtor has little or no tangible assets, and if it were liquidated it is not unlikely that the trailer owners, or at least many of them, would have difficulty realizing anything for their trailers [13].

■ For an arrangement to be "feasible," the creditors must be assured of receiving what is promised them under the arrangement, but it does not require an assurance of future business success. In re Slumberland Bedding Co., D.C.Md., 115 F.Supp. 39.

Affirmed.

---

17(c), Securities Act of 1933, 15 U.S.C. § 77q(c); Section 393, Bankruptcy Act, 11 U.S.C. § 793.

12. In its brief, the S.E.C. states:
"It has been the Commission's position throughout that the simplest and most efficient resolution of the issue it has raised would be for the debtor and Capitol to send to trailer owners a statement or letter containing the material facts to which they are entitled. Had this been done, there would have been no need for this appeal or the expensive

and time-consuming antecedent proceedings. Trailer owners could have been resolicited to accept the arrangement on the basis of adequate and accurate information."

13. In the debtor's proposed arrangement it was stated: "Unless the plan is adopted, proponents suggest that creditors will receive little, if anything, in settlement of debtor's obligation to them, and that trailer owners may find themselves unable to realize any value for their trailers or any income from their operation."