In the Matter of AMERICAN GUARANTY CORPORATION, Debtor.

No. 63B17.

United States District Court
D. Rhode Island.

Sept. 11, 1963.

962

Joseph C. Sullivan, New York City, for Securities and Exchange Commission.

Alfred B. Stapleton, Wilfrid E. McKenna, Providence, R. I., Marcien Jenckes, Boston, Mass., Andrew P. Quinn, Providence, R. I., Frederick G. Fisher, Jr., Boston, Mass., for debtor corporation.

Marshall Swan, Abraham Belilove, Providence, R. I., John Cancian, Boston, Mass., for various parties in interest.

DAY, District Judge.

American Guaranty Corporation (hereafter called "the debtor") on January 18, 1963 filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. On January 25, 1963 a statement of affairs and schedules was filed by the debtor and a receiver of its property was appointed by the Referee in Bankruptcy.

Subsequently, on May 24, 1963 the Securities and Exchange Commission (hereafter called the SEC) moved under the provisions of Section 328 of the Bankruptcy Act, 11 U.S.C.A. § 728,[1] to dismiss said petition unless said petition is amended or a new petition is filed so that the proceedings may continue under Chapter X of said Bankruptcy Act.

The SEC's motion is supported by an affidavit of one of its attorneys. After reciting the recent history of the debtor, it alleges, as reasons for the relief requested, that the needs of the debtor require the application of Chapter X for the successful reorganization of the debtor, the need for an investigation by a disinterested trustee under Chapter X of certain transactions between the debtor and certain companies in which its former president, D. J. Perri, had an interest, and of certain alleged violations by the debtor of the federal securities laws; that the proposed plan of arrangement submitted by the debtor would unfairly affect the rights of public security holders without any corresponding sacrifice by stockholders of the debtor; and the need of the various procedural and substantive safeguards provided by Chapter X but not by Chapter XI.

The motion is vigorously opposed by the debtor, the Official Creditors Committee of the debtor and by certain of the latter's stockholders. No support of the motion was voiced by any creditor of the debtor. In opposition to said motion there was submitted an affidavit by two attorneys for said committee. This af-

---

1. 11 U.S.C.A. § 728 provides:

"Dismissal, proceedings; amended petition

"The judge may, upon application of the Securities and Exchange Commission or any party in interest, and upon such notice to the debtor, to the Securities and Exchange Commission, and to such other persons as the judge may direct, if he finds that the proceedings should have been brought under chapter 10 of this title, enter an order dismissing the proceedings under this chapter, unless, within such time as the judge shall fix, the petition be amended to comply with the requirement of chapter 10 of this title for the filing of a debtor's petition or a creditors' petition under such chapter, be filed. Upon the filing of such amended petition, or of such creditors' petition, and the payment of such additional fees as may be required to comply with section 532 of this title, such amended petition or creditors' petition shall thereafter, for all purposes of chapter 10 of this title, be deemed to have been originally filed under such chapter."

fidavit depicts the recent history of the debtor in a far different light from that filed by the SEC. It attributes the debtor's financial plight to the combined action of institutional creditors in refusing to extend further credit to the debtor which had been borrowing from them on a short term basis while extending credit to its purchasers and lessees on a long term basis. It also asserts their belief as a result of their investigation that there is no reasonable ground for any belief that the debtor can be reorganized so that it can continue operations on the scale it was conducting when its financial difficulties caused it to file its petition under Chapter XI, and, further, that said Chapter XI provides the only appropriate relief for the debtor. Said affidavit further asserts that under the plan of arrangement proposed by the debtor an adequate and thorough investigation of any wrongdoing by past management of the debtor will be conducted under the direction and supervision of the Referee in Bankruptcy and that there is no need for the expensive and protracted proceedings which a transfer to Chapter X will undoubtedly entail.

After lengthy oral arguments by interested parties on June 18 and 19, 1963 I reserved decision on said motion pending the filing of memoranda by counsel for the interested parties, which have now been thoroughly considered by me.

### The Debtor: its History, Operations and Finances.

The debtor was incorporated in 1920 under the laws of the State of Rhode Island. Until 1957 it was engaged in business as a commercial finance company buying installment lien obligations from dealers and manufacturers. During this period it maintained offices in Providence, Rhode Island, and in Boston, Massachusetts. Its operations were essentially local, or, at the most, regional.

2. With the exception of a rights offering to stockholders under a claimed exemption from registration pursuant to Regulation A of the Securities Act of 1933,

In 1957 it changed the scope of its operations and entered into the business of selling and leasing industrial and commercial equipment under long term installment sales contracts and long term leases. It was then borrowing money from institutional lenders on a short term basis for its working capital and extending credit to the purchasers and lessees of its equipment on a long term basis. This new business venture by the debtor marked the beginning of a period of extremely rapid expansion of its activities. Within eighteen months prior to January 1963 it opened additional offices in eight cities and sold or leased equipment in at least twenty states. Many of the installment sales contracts and leases which comprise most of the assets of the debtor involve equipment for drilling and operating oil wells.

The rapid expansion of the operations of the debtor between 1955 and 1963 is shown in the following table:

| Fiscal Year Ending September 30 | Income from Operations | Net Income (Loss) Before Federal Taxes |
|---|---|---|
| 1955 | $ 346,010 | $ 180,528 |
| 1956 | 458,834 | 263,023 |
| 1957 | 720,193 | 389,173 |
| 1958 | 813,841 | 421,607 |
| 1959 | 1,199,511 | 560,923 |
| 1960 | 1,620,270 | 538,010 |
| 1961 | 3,899,040 | (2,902,319)* |
| 1962 | 6,242,657 | |

* Before provision for refund of federal income taxes of $891,320 and after special charges of $990,000 and $2,300,000, respectively, for possible losses on notes and accounts receivable and leased equipment.

Throughout its existence it has sold its securities to the public[2] with public investment, primarily by small investors, increasing greatly between 1959 and 1962.

the debtor has never registered its securities with the SEC. It has claimed that it sold its securities exclusively intrastate to residents of Rhode Island.

In addition to notes and debentures owned by institutions the debtor had outstanding as of September 30, 1962 the following securities:

| | Amount | Approximate No. of Holders |
|---|---|---|
| 4% Investment certificates | $3,371,970 | 2,576 |
| 5% and 5½% Subordinated Debentures due 1968 and 1974 | 1,000,000 | 120 |
| 6% Capital Notes | 270,000 | 90 |
| Preferred Stock $.30 Cumulative $1 Par Value | 500,000 shares | 706 |
| Common Stock, $1 Par Value | 204,199 shares | 418 |
| Total Number of Security Holders | | 3,910 |

The debtor's audited balance sheet as of September 30, 1962 shows total assets of $26,738,155, consisting of the following: Cash, $1,645,980; net receivables, $6,723,178; equipment under lease to others, $16,938,729; a claim for refund of federal taxes, $1,007,320; and other assets of $422,948. Its liabilities are shown thereon to be $24,674,039, of which $20,032,069 is owed to institutional creditors and others, and $4,641,970 to public security holders, leaving a net worth of $2,064,116.

It appears that in the fall of 1962 certain banking institutions which had been making loans to the debtor on a short term basis became suspicious of its financial condition. In September 1962 a local bank caused an examination of its condition to be made, which indicated that the debtor was facing an impending financial crisis in its affairs. Subsequently, in early November 1962 another bank creditor situated outside this state caused a similar examination to be made by its examiners. It concluded also that financial troubles for the debtor were fast approaching.

At about the same time other institutional creditors which had been lending money to the debtor on a long term basis began to look for possible incidents of default which would make the debtor's obligations to them immediately due and payable.

Thus, early in December 1962 as rumors of the debtor's questionable financial condition spread throughout the financial world, the debtor found (1) its obligations to short term lenders were falling due and that they were unwilling to extend further credit; (2) its obligations to long term lenders were being called because of incidents of default by it; and (3) it was experiencing a high rate of delinquency in payments due to it under its installment sales contracts and leases.

Several explanations or reasons for the financial troubles of the debtor have been advanced by the interested parties. The debtor attributes them to extremely rapid expansion of its activities without an accompanying increase in the capabilities or sophistication of its management. One of its bank creditors suggests that its plight was due to poor accounting procedures, questionable depreciation practices and lack of proper internal controls. The SEC asserts that at least one of the

reasons therefor was mismanagement, including improper transactions between the debtor and other companies in which its then president, D. J. Perri, had an interest.

Early in December 1962 after the debtor's condition became generally known in the financial world, its institutional creditors took action. A Creditors Committee, composed originally of representatives of insurance companies and banks, was organized. At the insistance of this committee Perri resigned as president of the debtor, and John W. Weibel, in whom said committee apparently has complete confidence, was appointed as his successor.

Thereafter, following further analysis and study of the debtor's condition and discussions between said committee and representatives of the debtor, said petition under Chapter XI was filed and a receiver of its property was appointed by the Referee. Following the appointment of said receiver, the creditors at a meeting appointed a Creditors Committee consisting of the members of said original committee and additional members representing holders of investment certificates.

Since his appointment the receiver has closed all the offices of the debtor except those in Providence, Baltimore, Maryland, and Houston, Texas. No new business has been transacted by the debtor. Since the appointment of said receiver more than $4,000,000 has been collected on said receivables.

As a result of continued negotiations between the Official Creditors Committee and the debtor, a plan of arrangement entitled "Modified Plan of Arrangement" has been evolved and has been submitted to the unsecured creditors for acceptance.

*The Modified Plan of Arrangement.*

The modified plan of arrangement divides the unsecured debts of the debtor into two classes, viz: (1) debts entitled to priority of payment under said Bankruptcy Act, and all costs of administration entitled to priority thereunder; and (2) all other unsecured debts allowed and approved by the Court including claims arising from the rejection of executory contracts. After making provision for the payment of said debts entitled to priority said plan provides that upon its confirmation by said Referee the sum of $500 or the amount of the debt, whichever is less, shall be paid to each unsecured creditor by the receiver, the amount so paid to be charged against further distributions. It also provides that subsequent thereto all monies collected by the debtor on leases and installment notes, excepting those expended for operating expenses, shall be distributed by the receiver in increments of $500,000 pro-rata to said unsecured creditors in accordance with their respective rights and priorities until said claims are paid in full. Under its provisions no interest on said unsecured debts shall be paid for the period beginning January 18, 1963 and ending eighteen months subsequent to the confirmation of said plan or January 18, 1965, whichever date first occurs. Said plan also provides that the debtor shall confine its activities and efforts to the collection of monies due and payable to it and to the sale of personal property. An operating subsidiary shall be formed for the transaction of new business but no funds collected by the debtor shall be used in the activities of such subsidiary without the approval in writing of the creditor to whom such funds are to be distributed.

The execution of said plan is to be under the control of an Executive Committee of seven members, six of whom are to be selected and subject to removal by said Creditors Committee, and one of whom shall be appointed and subject to removal by the Board of Directors of the debtor. Such Executive Committee shall have such authority as is normally exercised by a Board of Directors. Upon the satisfaction or settlement of all obligations due and owing by the debtor to unsecured creditors at the time of confirmation, and interest accruing thereon, or with the unanimous consent of all its creditors the debtor will be considered free of said

plan of arrangement, and control of its affairs shall then revert to its Board of Directors and stockholders, as provided in its by-laws. Under the plan provision is made for the establishment of an operating fund of $200,000, and each month the debtor may retain from receipts an amount sufficient to maintain said fund but all other receipts are to be delivered to said receiver for distribution to said unsecured creditors, as aforesaid.

The plan also provides that the Referee, or a person designated by him, shall investigate or cause to be investigated the allegations made by the SEC as to wrongdoing by past management in the conduct of the debtor's business and as to possible violations by the debtor of federal laws and regulations pertaining to the issuance and registration of securities, the results of such investigation to be made available by him to the SEC and to the creditors and stockholders of the debtor. To effectuate such an investigation he is authorized to appoint such legal counsel, accountants and investigators as shall be required, the cost thereof to be paid by the debtor, as determined and allowed by him. Said plan expressly provides that no creditor, by assenting to said plan, shall be deemed to have waived his rights to enforce claims for loss sustained by him, by reason of past improper management of the debtor or violations by the debtor of said laws and regulations.

Other provisions in said plan are of the general type permitted by § 357 of said Bankruptcy Act (11 U.S.C. § 757), and any discussion of them would serve no useful purpose.

### Discussion.

■ The determination of whether a debtor should be seeking relief under Chapter XI or Chapter X calls for the exercise by a court of its "sound discretion" and "business judgment." General Stores Corp. v. Shlensky, 1956, 350 U.S. 462, 468, 76 S.Ct. 516, 100 L.Ed. 550; Securities and Exchange Commission v. United States Realty & Improvement Co., 1940, 310 U.S. 434, 456, 60 S.Ct. 1044,

84 L.Ed. 1293; Grayson-Robinson Stores, Inc. v. Securities and Exchange Commission, 2 Cir., 320 F.2d 940; In re Lea Fabrics, Inc., 1959, 3 Cir., 272 F.2d 769, 771; In re Transvision, Inc., 1954, 2 Cir., 217 F.2d 243, 246.

■ In making this determination the primary consideration is the "needs to be served." In Securities and Exchange Commission v. United States Realty & Improvement Co., supra, the Supreme Court said at page 455 of 310 U.S., at page 1053 of 60 S.Ct.:

"Obviously the adequacy of relief under Chapter XI must be appraised in comparison with that to be had under Chapter X, and in the light of its effect on all the public and private interests concerned including those of the debtor * * *."

And later in General Stores Corp. v. Shlensky, supra, the Supreme Court in reference to its opinion in the United States Realty case said at pages 465 and 466 of 350 U.S., at pages 518, and 519 of 76 S.Ct.

"* * * Rather we emphasized the need to determine on the facts of the case whether the formulation of a plan under the control of the debtor, as provided by c. XI, or the formulation of a plan under the auspices of disinterested trustees, as assured by c. X and the other protective provisions of that chapter, would better serve 'the public and private interests concerned including those of the debtor.' 310 U.S., at 455 [60 S.Ct. at 1053].
* * *

"The character of the debtor is not the controlling consideration in a choice between c. X and c. XI. Nor is the nature of the capital structure. It may well be that in most cases where the debtor's securities are publicly held c. X will afford the more appropriate remedy. But that is not necessarily so. A large company with publicly held securities may have as much need for a simple composition of unsecured debts as a

smaller company. And there is no reason we can see why c. XI may not serve that end. The essential difference is not between the small company and the large company but between the needs to be served."

■ In this case the principal assets of the debtor comprise receivables due under long term installment sales contracts and long term leases. The proposed plan of arrangement provides for the orderly liquidation of these receivables and the distribution of their proceeds as collected to the unsecured creditors of the debtor according to their respective interests. No readjustment of the capital structure of the debtor is involved. The only modification of the creditors' rights is that the accrual of interest on the obligations due to them is suspended for a maximum period of two years from the date of the filing of the debtor's petition for relief. In the light of the progress that has been made in the liquidation of the debtor's receivables during the pendency of the proceedings under Chapter XI, there is every reason to believe that said unsecured creditors, including the public security holders, will be paid in full. Conversely there was no showing by the SEC that they would fare as well under the expensive and protracted proceedings that would be entailed under Chapter X.

■ The fact that under said plan of arrangement some equity may be possibly preserved to the stockholders is not a ground, in my opinion, for the dismissal of the debtor's petition under Chapter XI. Section 366 of the Bankruptcy Act, 11 U.S.C.A. § 766, provides in part that

"Confirmation of an arrangement shall not be refused solely because the interest of the debtor, or if the debtor is a corporation, the interests of its stockholders or members will be preserved under the arrangement."

As hereinbefore recited, the affidavit filed in support of the motion of the SEC makes certain allegations as to past mismanagement of the debtor, as to improper transactions between the debtor and companies in which its former president, D. J. Perri, had an interest and as to alleged violations by the debtor of federal statutes and regulations in the issuance and sale of its securities. The SEC contends that these charges should be investigated by a disinterested trustee appointed under the provisions of Chapter X. The proposed plan provides for an investigation of these charges under the direction and supervision of the Referee in Bankruptcy. It also provides that the results of such investigation shall be made available to the SEC and to the creditors and stockholders of the debtor, and that no creditor shall be deemed, by assenting to said plan, to have waived his rights to enforce claims for any loss sustained by him by reason of said alleged mismanagement or misdeeds. I am confident that any investigation conducted under the direction and supervision of the experienced, competent and conscientious Referee will be completely adequate and thorough and will uncover any wrongdoings by past management, if in fact any occurred.

After considering all of the evidence before me in the light of the criteria laid down by the Supreme Court I am satisfied that the debtor's petition for relief should not be dismissed. The proposed plan of arrangement is a "simple composition" within the provisions of Chapter XI. It constitutes a logical and sound method for the preservation of the rights of the unsecured creditors and of some equity for the stockholders. The transfer of the debtor's petition to Chapter X would, as the Creditors Committee, the debtor and said stockholders contend, result only in costly and protracted proceedings detrimental to their interests. In my opinion the continuation of the debtor in Chapter XI will best serve all public and private interests here concerned.

Accordingly, the motion of the SEC to dismiss the debtor's petition for relief under Chapter XI is denied.