**SECURITIES AND EXCHANGE COM-
MISSION, Appellant,**

v.

**CRUMPTON BUILDERS, INC., et al.,
Appellees.**

No. 20712.

United States Court of Appeals
Fifth Circuit.

Oct. 21, 1964.

David Ferber, Atty., SEC, Philip A.
Loomis, Jr., Dolph B. H. Simon, Nathan
Markowitz, Washington, D. C., for appel-
lant.

Anthony S. Battaglia, Madeira Beach,
Fla., for appellees.

Before RIVES, JONES and WISDOM,
Circuit Judges.

WISDOM, Circuit Judge.

This case presents the question whether
a proceeding under Chapter XI of the
Bankruptcy Act should be dismissed on
the ground that Chapter X of that Act
affords the appropriate relief. In light
of the nature and history of the bankrupt,
the make-up of its equity and debt hold-
ers, and the creditor arrangement that
it proposed before the district court, we
hold that the district court exceeded the

proper limits of its judicial discretion in denying the motion of dismissal. We reverse.

Crumpton Builders, Inc., the parent corporation, owns all of the stock of the other nine corporate appellees. Since 1954 the Crumpton complex has engaged in the business of building, selling, and financing "shell homes" over a nine state area in southeastern United States. Its operations were profitable until 1962 when the national shell home market suffered a sharp decline lasting for at least eighteen months. Its net income for the years 1956 to 1962 were as follows:

| Fiscal year ending June 30 | Net income after taxes |
|---|---|
| 1956 | $ 16,872 |
| 1957 | 57,042 |
| 1958 | 28,910 |
| 1959 | 76,580 |
| 1960 | 173,561 |
| 1961 | 100,991 |
| 1962 | (1,358,444) |
| 6 months ended 12/30/62 | ( 416,180) |
| Total Net losses | $(1,320,668) |

March 5, 1963, Crumpton filed a petition for an arrangement under Chapter XI of the Bankruptcy Act (Bankruptcy Act §§ 301–99, 52 Stat. 905 (1938), as amended 11 U.S.C. §§ 701–99 (1952)). March 14, 1963, it filed a proposed arrangement whereby secured claims were to be paid in full, after which unsecured claims were to be discharged on the basis of 15 cents on the dollar.[1] As of December 31, 1962, the consolidated assets had a book value of $3,408,928 of which $2,347 was in cash and $1,765,048 was in accounts receivable. There were secured claims in the amount of $1,389,595 and unsecured obligations of $2,032,769 leaving a book value insolvency of $13,436. Of the unsecured claims trade creditors held $607,109 while the remaining $1,-425,660 was in the form of 9% convertible debentures.

The losses began only a short period after Crumpton had "gone public" and acquired approximately $2,700,000 in working capital from the investing public. This sum was raised by marketing $3,000,000 in securities under a registration statement filed with the SEC. The securities consisted of 150,000 "units" each of which consisted of one 9% convertible debenture with a principal amount of $10, five shares of common stock with a par value of $.50, and one warrant to purchase another unit (one debenture and five shares) exercisable in 1964 upon payment of an additional $14. The registration became effective February 10, 1962, and the securities were marketed immediately afterwards. The units were divisible only after the original sale. 630 investors in 24 states hold the outstanding debentures in the face amount of $1,425,660. About 2,-000 investors hold the 1,250,000 shares of Crumpton common stock. Russel B. Crumpton, president of the company, and his wife own 39% or 495,000 shares of the common stock.

After the proposed arrangement was filed March 14, 1963, the district court granted the Commission's motion to intervene in the proceeding. The court also ordered that certain acceptances signed by creditors be rendered null and void as a result of their being solicited in a manner considered confusing and misleading.

April 17, 1963, the Commission filed its motion to dismiss the arrangement proceedings under Chapter XI of the Bankruptcy Act unless the debtors' petition were to be amended, or a creditors' petition were to be filed, in conformity with Chapter X (Bankruptcy Act §§ 101–276, 52 Stat. 883 (1938), as amended 11 U.S.C. §§ 501–676 (1952)). The First National Bank of Tampa, Florida, the indenture trustee for the convertible debentures, joined in the motion. The movants appeal from the denial of the motion.

In Securities and Exchange Commission v. United States Realty & Improvement Co., 1940, 310 U.S. 434, 448–451, 60 S.Ct. 1044, 1050–1051, 84 L.Ed. 1293, 1300–1301, the Supreme Court dis-

---

1. Payment was to be made of one half immediately, one half in nine months.

cussed at length the history and complexities of proceedings under Chapter X, permitting a "reorganization" of any class of securities, and Chapter XI, permitting only an "arrangement" of unsecured claims.[2] In brief, proceedings under Chapter XI are instituted by the bankrupt, are subject to minimum controls by the courts or their agents, and are marked by their speed and lack of expense. Reorganization proceedings under Chapter X are slower,[3] more expensive, and have more elaborate safeguards to protect the public and the parties. One of the important purposes of Chapter X is to protect widely dispersed and largely uninformed investors and creditors against underhanded manipulations by corporate insiders.[4]

The jurisdictional scope of Chapters X and XI, both enacted as part of the 1938 Chandler Amendment to the Bankruptcy Act, has perplexed lawyers and judges. Chapter X seems appropriate for a giant corporation with a complex debt and equity structure or for a corporation in dire need of new capital or management; Chapter XI seems appropriate for a small closely held corporation to settle with its trade creditors. But there was no formula in the statute and no guideline in the legislative history.[5] In the United States Realty case the Supreme Court, recognized the power of a district court, on intervention by the SEC, to require the transfer of a proceeding from Chapter XI to Chapter X, after due consideration of the nature of the debtor, the arrangement proposed, and the number, nature and position of its creditors. The Court favored a Chapter X proceeding on the grounds that: (1) Chapter XI does not contain necessary safeguards for public investors; (2) where the debtor has public investors, a plan under Chapter XI would not be "fair and equitable" according to the traditional interpretation given that clause by the federal courts.

In 1952 Congress added Section 328 [6] to the Bankruptcy Act (11 U.S.C. § 728) [7] in order to codify the principles establish-

2. See also Rostow & Cutler, Competing Systems of Corporate Reorganization: Chapters X and XI of the Bankruptcy Act, 48 Yale L.J. 1334 (1939).

3. See Windle, Obstacles to Successful Reorganization, 36 Ref.J. 12 (1962).

4. William O. Douglas, at that time chairman of the SEC, stated: "The record of corporate reorganizations of past—and particularly, those of the recent depression—is not pleasant. It shows the absolute control exercised over reorganizations by the inside few; it shows the financial well being of investors and the public sacrificed to the insiders' desires for protection and further profit. The record shows with overwhelming proof, that plans of reorganization were frequently dictated by a single interest—by a closely knit inside group; primarily in the interest of that group and of dubious wisdom so far as interests outside the inner circle were concerned." H.R.Rep. No. 1409, 75th Cong., 1st Sess. 37 (1938).

5. See Jackson, The Need for Amendment of the Chandler Act, A3 Corp.Reorg. & Am.Bank.Rev. 35 (1939) ; Note, Corporate Giants and Chapter XI of the Chandler Act, 8 Geo.Wash.L.Rev. 1054 (1940); Comment, 39 Mich.L.Rev. 102 (1940).

6. Section 328 of the Act provides as follows:
"The judge may, upon application of the Securities and Exchange Commission or any party in interest, and upon such notice to the debtor, to the Securities and Exchange Commission, and to such other persons as the judge may direct, if he finds that the proceedings should have been brought under Chapter X of this Act, enter an order dismissing the proceedings under this chapter, unless, within such time as the judge shall fix, the petition be amended to comply with the requirement of Chapter X for the filing of a debtor's petition or a creditor's petition under such chapter, be filed. Upon the filing of such amended petition, or of such creditors' petition and the payment of such additional fees as may be required to comply with section 132 of this Act, such amended petition or creditors' petition shall thereafter, for all purposes of Chapter X of this Act, be deemed to have been originally filed under such chapter."

7. H.R.Rep. No. 2320, 82nd Cong., 2nd Sess. (1952) (2 U.S.C.Cong. & Adm. News, 82nd Cong., 2nd Sess. (1952) p. 1979).

ed in the United States Realty case. The applicability of this section is at issue in this case.

Since the decision in United States Realty, one Supreme Court case,[8] more than half a dozen circuit court cases,[9] and almost as many district court proceedings [10] have wrestled with the problem of transfer from Chapter XI to Chapter X. In United States Realty the court's primary concern was that a procedure be chosen which would be best calculated to bring a "fair and equitable" result, as required by the language of Chapter XI. The Court explained that the words "fair and equitable", are terms of art incorporating the absolute priority rule established in Northern Pacific R. Co. v. Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, and Case v. Los Angeles Lumber Products Co., 1939, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. This rule would require that a plan of reorganization reduce the claims of investors on a strict priority basis; junior interests would have to be scaled down before senior interests could be reduced. Here, all debt holders would have to agree to the arrangement or be satisfied *in whole* before shareholders could participate in a revitalized corporation. The Supreme Court recognized that insofar as equity holdings could not be juggled under Chapter XI absolute priority might never be possible in a Chapter XI proceeding, especially when a large number of debt holders were involved, but by the means of a good working fiction the court retained the possibility of using Chapter XI for closely held corporations. "In cases where subordinate creditors or the stockholders are the managers of the business, the preservation of going-concern value through their continued management of the business may compensate for reduction of the claims of the prior creditors without alteration of the management's interests, which would otherwise be required by the Boyd case." 310 U.S. at 454, 60 S.Ct. 1052 at 84 L.Ed. at 1303.

When Section 328 was added in 1952, Congress adopted the transfer procedure established in United States Realty but specifically removed the "fair and equitable" requirement. A great deal of controversy has centered over the meaning of this so-called "uncontroversial" omission.[11] There is little doubt of the general awareness of the infeasibility of applying the absolute priority rule in the Chapter XI context.[12] However, that the omission does not mean that fairness and equity, in their usual sense, are no longer relevant in determining between the priority of a Chapter X or Chapter XI, is clear from a moment's reflection. This view was quickly established. General Stores Corp. v. Shlensky, 1956, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550. Moreover, the amendment does not mean

8. General Stores Corp. v. Shlensky, 1956, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550.

9. In re American Trailer Rentals Company, 10 Cir. 1963, 325 F.2d 47, cert. granted, 376 U.S. 948, 84 S.Ct. 971, 11 L.Ed.2d 969; Grayson-Robinson Stores, Inc. v. S. E.C., 2 Cir. 1963, 320 F.2d 940; In re Lea Fabrics, Inc., 3 Cir. 1959, 272 F.2d 769, vacated as moot, 1960, 363 U.S. 417, 80 S.Ct 1258, 4 L.Ed.2d 1515; S.E.C. v. Liberty Baking Corp., 2 Cir. 1957, 240 F.2d 511, cert. denied 1957, 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 723; S.E.C. v. Wilcox-Gay Corp., 6 Cir. 1956, 231 F.2d 859; In re Transvision, Inc., 2 Cir. 1954, 217 F.2d 243, cert. denied S.E.C. v. Transvision, Inc., 1955, 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744; Mecca Temple of Ancient Arabic Order of Nobles of Mystic Shrine v. Darrock, 2 Cir. 1944,

142 F.2d 869, cert. denied 1944, 323 U.S. 784, 65 S.Ct. 271, 89 L.Ed. 626.

10. In re Dilbert's Quality Supermarkets, Inc., E.D.N.Y. 1963, Docket No. 62–B–920; In re Davega Corp., S.D.N.Y.1963, CCH Bankr.Rep. ¶60, 434; In re Barchris Const. Corp., S.D.N.Y.1963, 223 F. Supp. 229; In re American Guaranty Corporation, D.R.I.1963, 221 F.Supp. 961; In re Herold Radio & Electronics Corp., S.D.N.Y.1961, 191 F.Supp. 780.

11. H.R.Rep. No. 2320, 82nd Cong., 2nd Sess. 3 (1952) (2 U.S.C.Cong. & Adm. News, 82nd Cong., 2nd Sess. (1952) p. 1962).

12. H.R.Rep. No. 2320, 82nd Cong., 2nd Sess. (1952) (2 U.S.C.Cong. & Adm. News, 82nd Cong., 2nd Sess. (1952) p. 1981).

that the fact that shareholders were participating in a revitalized corporation before all dissenting creditors were paid off in full was not a relevant consideration in determining fairness and equity, in their usual sense. Securities and Exchange Commission v. Liberty Baking Corp., supra, 240 F.2d p. 515 no. b. What it does mean is that there is no longer any absolute necessity for absolute priority, nothing more.

While the General Stores case reinstated or at least reinforced the traditional notions of fairness and equity, it did so in a new tone. For the first time the fairness of the proceeding was played down in subordination to the *needs* of the proceedings and the *feasibility* of the arrangement proposed.

In spite of the Supreme Court's clear mandate for a case by case approach, there have been many and various calls for absolute rules. A popular demand of the past was for requiring a Chapter X proceeding whenever the securities of the corporation were held by the public rather than by a closed group. United States Realty accepted this principle. After the 1952 amendments, General Stores and Transvision repudiated the principle as an absolute rule. But we take this to mean that a large publicly held corporation still may be held to close supervision, because its shareholders may not have ready access or familiarity with the relevant considerations and information when confronted with a reorganization situation.

The SEC urges us in this case to adopt an ironclad rule that transfer must be required when some of the unsecured debt is held by the investing public in the form of debentures rather than in the form of trade debt. This consideration was relevant in the Grayson-Robinson, Transvision, Lea Fabrics, and Wilcox-Gay cases. Whether it must be the controlling factor is something else again.[13] That some of the creditors are investors who had nothing more than a registration statement or a prospectus to guide them in their investment choice is a factor in favor of strict control of any reorganization proceeding. Many such investors are less familiar with the inner workings of the business than are trade creditors who are connected, at least in some way, with the debtor's operations. Debenture holders are also less likely to be able to evaluate the performance of the present management and less capable of predicting the need for new or additional capital outlays. But we feel that the relatively unprotected position of an investor or a debenture holder does not in itself necessitate a strict rule requiring the use of Chapter X at all times. A longtime debenture holder familiar with the operations of the debtor who may have chosen to hold the debt of an essentially closed corporation because of his own peculiar financial and investment needs requires less protection than the ordinary trade creditor. At the same time a proposed arrangement whereby the debenture holding public suffers only slight financial harm, and whose acceptance is solicited by thoughtful and completely impartial information, requires no great or continued supervision.

■ Through the spectrum of cases various criteria slowly emerge.[14] The

13. See Weintraub & Levin, A Sequel to Chapter X or Chapter XI: Coexistence for the Middle-Sized Corporation, 26 Fordham L.Rev. 292, 300 (1957).

14. An excellent case by case commentary has emerged from a succession of articles written by Benjamin Weintraub and Harris Levin. See Weintraub, Levin & Novick, Chapter X or Chapter XI: Coexistence for the Middle-Sized Corporation, 24 Fordham L.Rev. 616 (1956); Weintraub & Levin, A Sequel to Chapter X or Chapter XI: Coexistence for the Mid-

dle-Sized Corporation, 26 Fordham L.Rev. 292 (1957); Weintraub & Levin, Reorganization or Arrangement: An Analysis of Contemporary Trends in Recent Cases, 37 Ref.J. 103 (1963). See also Note, Allocation of Corporate Reorganizations Between Chapters X and XI of the Bankruptcy Act, 69 Harv.L.Rev. 352 (1955); Comment, Drawing a Line Between Chapters X and XI of the Bankruptcy Act—Standard of Reason vs. Strict "Public Securities" Test, 50 Nw.U.L.Rev. 761 (1956); Recent Decisions, Bank-

proposed arrangement should be fair and equitable to all interests on its face. It should be feasible. There should be no particular need for recapitalization or replacement of management. There should be no indication of unfair or treacherous dealings by management or any other group standing to gain by the arrangement. There should be a good prospect for future business; a shaky financial history militates against the expectancy of a sound financial future. There should be full and adequate information given to all who assent to any plan of arrangement. What constitutes full and adequate information should be judged by the number and nature of the corporate owners and creditors. Against those factors favoring caution and supervision, a court must weigh the consumption of time and money required by a Chapter XI proceeding; the possibility of a disruption of necessary immediate credit or merchandise that may result from a Chapter X proceeding; the possibility that an effective reorganization will never really emerge from a Chapter XI morass, and whether such a reorganization would such a good thing after all. A bankruptcy court has a broad range of discretion; it is a court of equity and it must exercise its mandate and use its analytic tools to make sure that the Bankruptcy Act, as a whole, is used for the equitable purposes for which it was intended.

▮ In spite of the broad sweep of a district court's discretion, we hold that the court overextended itself when it refused the petition of the SEC to dismiss this proceeding from Chapter XI. The bankrupt corporation went public only eighteen months before these proceedings. Under Chapter XI the same management would be primarily in control and largely unsupervised. The large equity position held by management also suggests caution and, while there are no allegations of unfair dealing or managerial misconduct in the affairs of the busi-

ness, the manner in which affirmations for the arrangement were solicited caused the court to void the responses; a truly impartial solicitation may not be possible.

Finally, there is the arrangement itself. The government argues that a 15 per cent recovery is improper when the equity is left basically unimpaired, that is, the stockholders are left owning the entire corporation. The bankrupt argues that the creditors, particularly the debenture holders, are receiving a rare bargain since the market price for the debentures has fallen as low as 1 cent on the dollar in the past eighteen months and has averaged around 6 or 7 cents on the dollar.

In this case the market price for the securities is not a reliable criterion of value, since the market must evaluate the securities in their present circumstances without any real information or knowledge concerning a corporate resuscitation. A more relevant and compelling consideration is evaluation of the proposed arrangement in the light of the corporate balance sheet, per book, as of December 31, 1962. The arrangement plan would liquidate in full the secured indebtedness of $1,389,595 and would dispose of the unsecured indebtedness (which totals $2,032,769) by a payment of 15 per cent, or $304,915. This plan would entail a total payment of $1,684,510 of which $1,-541,052.50 would be paid immediately in cash, the balance to be paid in nine months. Two questions are immediately raised. With a cash balance of $2,347, a court might well wonder how such a payment would be financed. This question of course is wholly aside from the working capital requirements of a company that plans to build and finance residential construction. With the company in such an illiquid position, the possibility that a broad reorganization involving a recapitalization might be necessary to revive the bankrupt corporation must become a problem that may well require scrutiny.

ruptcy—Limitations on Availability to Corporations of Arrangement Proceedings, 55 Mich.L.Rev. 125 (1956); Comment, Debtor Rehabilitation: Common Law Settlements, Chapters X and XI—An Analysis and Discussion, 7 N.Y.L.F. 404 (1961).

913

While the corporation's position is illiquid, it is not deeply sunk into insolvency; its capital deficit stands at only $13,436. By the terms of the proposed arrangement, the holders of equity will be raised from a position of deficit ($13,-436) to a position of substantial capital balance ($1,724,418), at least from the viewpoint of book capital. Insofar as over $2,700,000 of book assets are represented by accounts receivable and inventory, we can assume that most of the book value capital balance will not be illusory. The fact that, as we have already mentioned, no rule of absolute priority can be controlling, does not mean that Chapter XI can be used for one group in interest to achieve vast benefits at the expense of another group. The substantial improvement of the capital position of the equity holders, together with the large equity position held by the active management, is another strong factor that militates for the stricter and more complete supervision afforded under Chapter X.

For these reasons we hold that the district court went beyond sound judicial discretion when it dismissed the motion of the Commission. The judgment is reversed and remanded for proceedings consistent with this opinion.