339 F.2d 14
 SECURITIES AND EXCHANGE COMMISSION, Appellant,
v.
CANANDAIGUA ENTERPRISES CORPORATION, Debtor-Appellee.
SECURITIES AND EXCHANGE COMMISSION, Appellant,
v.
FINGER LAKES RACING ASSOCIATION, Inc., Debtor-Appellee.
 No. 102, Docket 29012.
 United States Court of Appeals Second Circuit.
 Argued Oct. 21, 1964.
Decided Nov. 18, 1964.
 
 David Ferber, Washington, D.C. (Philip A. Loomis, Jr., General Counsel, Washington, D.C., Richard V. Bandler, Asst. Regional Administrator, Donald L. Roth, Attorney, New York City), for Securities and Exchange Commission.
 Sydney Krause, New York City (Harris, Beach, Keating, Wilcox, Dale & Linowitz, Rochester, N.Y., Goldman & Drazen, New York City) (Milton D. Goldman, Wilfred R. Caron, New York City, Nicholas E. Brown, Kreag Donovan, Rochester, N.Y., of counsel), for debtors.
 Paul J. Suter and Robert Miller, Rochester, N.Y., for Creditors' Committee.
 Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal by the Securities and Exchange Commission, like that in Grayson-Robinson Stores, Inc. v. SEC, 320 F.2d 940 (2 Cir.1963), brings before us an order denying a motion under 328 of the Bankruptcy Act to dismiss proceedings under Chapter XI unless the debtors' petition were amended, or a creditors' petition filed, to seek relief under Chapter X. Despite our reluctance to interfere with the wishes of the persons whose money is at stake, we are here constrained to direct that the SEC's motion be granted.
 
 
 2
 Canandaigua Enterprises Corporation and its 99% Owned subsidiary Finger Lakes Racing Association, Inc., filed a joint petition under Chapter XI on December 19, 1963. Canandaigua owns 490 acres near that town, on which it has built a race track. It has leased 200 acres including the track to Finger Lakes, reserving the right to operate or license the parking and catering concessions, for a rent equal to 90% Of the net income. Finger Lakes holds a franchise from the New York State Racing Commission to operate the track.
 
 
 3
 Canandaigua's capitalization consists of $3,921,000 of unsecured 7% Convertible debentures due July 1, 1976; 607,730 shares of Class A and 376,249 shares of Class B stock (convertible under certain circumstances into Class A), with equal voting but different dividend rights; and 59,946 warrants to purchase Class A stock at $5 per share. The debentures and both classes of stock were registered pursuant to 6 of the Securities Act of 1933, 15 U.S.C. 77f, and have been traded over the counter. Approximately 40% Of the Class A stock, 240,000 shares, was sold to the public in 1961 in units along with the debentures. There are approximately 2,800 holders of debentures, 3,200 of Class A and 130 of Class B stock. Officers and directors own 6% Of the Class A and 73% Of the Class B stock, or 30% Of the total.
 
 
 4
 The $5,363,400 received from the private and public sale of securities proved inadequate for the debtors' capital requirements. Their financial plight was aggravated by an operating loss of $1,235,700 (before taxes and depreciation) during the initial racing season in 1962. Various efforts to secure additional financing led ultimately to obtaining a new $1,500,000 first mortgage from Emprise Corporation. The mortgage bears interest at the annual rate of 15% And matures October 25, 1965, save for $150,000 which was due October 25, 1964.[1] The 1963 racing season, although by no means the disaster of its predecessor, resulted in a cash operating loss. Near the turn of the year, with the January 1, 1964 interest payment on the debentures at hand, the debtors' cash balance had declined to $589. Hence the petition under Chapter XI. An unaudited balance sheet as of December 19, 1963, showed as liabilities, in addition to the first mortgage and the debentures and interest thereon, current liabilities, primarily to trade creditors, of some $500,000, and other unsecured indebtedness of some $350,000. Stockholders' book equity, originally more than $3,000,000, had been reduced to about 10% Of that sum.
 
 
 5
 Shortly after the filing of the Chapter XI petition, a committee representing trade creditors and debenture holders was constituted.[2] After negotiations with the committee, the debtors, on March 11, 1964, filed an amended plan of arrangement, which we summarize as follows: Taxes and priority claims were to be paid in cash, and secured loans were to be assumed. The other creditors were divided into three classes: (1) the debenture holders; (2) other unsecured creditors holding claims of $1,000 or less; and (3) other unsecured creditors. The principal of claims in class (2) was to be paid in cash. The other unsecured creditors, class (3), were to receive non-negotiable non-interest bearing notes for the principal of their claims, payable in five annual instalments in varying amounts, the first instalment to be due on June 30, 1965. No payment that would reduce net working capital below $300,000 had to be made; any deficiency resulting from the operation of this proviso was to be added to the next instalment. The debenture holders were to receive new 7% Debentures dated as of July 1, 1964, having the same principal amount and maturity as the old debentures but changed in numerous respects. Interest for any year was to be limited to the net profit for that year, subject to the same proviso as to net working capital as just stated in respect of other unsecured creditors. Deficiencies due to the operation of this proviso would accumulate but deficiencies due to lack of net profits would not. In computing net profits, all payments to creditors in classes (2) and (3), 'irrespective of whether paid or deferred * * * shall be deemed expenses applicable to the fiscal year in which they become due and shall be deducted, in addition to the other usual expenses determined in accordance with generally accepted accounting principles, from the Company's earnings in computing such Net Profit.' The January 1, 1964, interest coupons were to be exchanged for certificates payable six years hence; the July 1, 1964, interest coupons were to go unpaid. The sinking fund provisions, which would have required annual payment of 5% Of the outstanding debentures beginning in June, 1966, were to be cancelled. The consent previously given to mortgaging the property up to $1,500,000 was to be extended to $2,500,000. In return, the conversion rate into Class A shares was reduced from $10 to $4 and the period for conversion was extended from May 10, 1966, to the maturity date-- any advantages from this being attenuated by excluding the issuance of up to 1,000,000 Class A shares prior to October 31, 1968 from the anti-dilution provisions of the indenture. In March, 1964, the Creditors' Committee recommended the plan to the creditors, to whom it sent acceptance forms.
 
 
 6
 About the same time the SEC moved under 328 that the proceedings be dismissed unless appropriate steps were taken to bring them under Chapter X. Various affidavits supporting and opposing the motion were filed by the SEC, the debtors and the creditors' committee. An affidavit by an attorney for the debtors pointed out that the New York State Racing Commission had approved a 1964 season of 125 days, as against the 116 operated in 1963 and the 75 in 1962; that prospects for the 1964 season were good; that it was not uncommon for race tracks to experience two years of unprofitable operation while public acceptance was being obtained; but that the track's financial difficulties had created 'a delicate situation' with service organizations and with the Horsemen's Benevolent & Protective Association, which had been prevailed upon to recommend participation in the 1964 meets 'on the basis that a Plan of Arrangement had been agreed on with the Official Creditors Committee and that such Plan of Arrangement should be consummated shortly after the opening of the 1964 racing season.' An affidavit of the president of Canandaigua, also treasurer and general manager of Finger Lakes, was to much the same effect; he was 'of the opinion, based upon his familiarity with the needs and desires of horsemen in connection with the entry of horses at race tracks during the racing season, that any uncertainty as to the identity of management, the individuals with whom the horsemen will have to deal and the problems resulting therefrom are bound to be unsettling.' There were no corroborating affidavits from the horsemen. An affidavit of one of the attorneys for the creditors' committee, filed at the hearing on the motion on May 5, stated that acceptances had already been received from some 1000 holders of $1,894,200 of debentures, and that only four persons, holding less than $10,000 of debentures, had expressed opposition. An affidavit from another attorney recited that acceptances had been received from a majority in number and amount of the other creditors who had filed claims, as well as from a number who had not filed, and that no such creditor had expressed opposition.
 
 
 7
 Finding that there was 'grave danger that the entire venture will be jeopardized if the matter is changed to a Chapter X proceeding' which 'could not be completed within the 1964 racing season, and probably not before the 1965 racing season' and that 'there is no charge of wrong doing on the part of the debtors,' Judge Burke, 'considering the 'needs to be served," denied the SEC's motion 'in the exercise of discretion.' We were advised at the argument that the 1964 racing season had produced a modest operating profit; we were told also that the debtors had received assurances that on consummation of the plan they could refinance the $1,500,000 15% Mortgage with a $2,500,000 7% Mortgage.
 
 
 8
 Our analysis in Grayson-Robinson, 2 Cir., 320 F.2d at 946-948, of the statutes and of the decisions up to that time makes a summary sufficient here. Section 130(7) demanded that a petition under Chapter X contain 'specific facts showing the need for relief under this chapter and why adequate relief cannot be obtained under chapter XI of this Act' and 146(2) provided that a petition under Chapter X shall not be deemed to be filed in 'good faith' if 'adequate relief would be obtainable by a debtor's petition under the provisions of chapter XI of this Act.' Although Chapter XI as originally enacted had no similar cross-reference with respect to Chapter X, SEC v. United States Realty & Improvement Co., 310 U.S. 434, 456, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940), ruled that 'what the court can decide under 146 of Chapter X as to the adequacy of the relief afforded by Chapter XI, it can decide in the exercise of its equity powers under Chapter XI' for the purpose of safeguarding that chapter from abuse. Mr. Justice Stone's opinion extensively analyzed the differences between the two chapters and the greater safeguards of Chapter X. But the point most emphasized was the requirement, then contained in both chapters, 221 and 366, that a plan must be 'fair and equitable'-- "words of art' having a well understood meaning' of strict priority of creditors over stockholders. 310 U.S. at 452-453, 456-457, 60 S.Ct. at 1052. Noting that the stock of United States Realty was publicly held but that Chapter XI, then as now, did not permit the imposition of sacrifices on the stockholders, the Court found the 'hope of securing an arrangement which is fair and equitable' under Chapter XI 'at best but negligible' and directed dismissal of the petition. 310 U.S. at 453, 60 S.Ct. at 1052.
 
 
 9
 The basis for the United States Realty decision was weakened in 1952, when Congress deleted the requirement of 366 that an arrangement under Chapter XI must be 'fair and equitable,' providing rather that confirmation 'shall not be refused solely because the interest of a debtor, or if the debtor is a corporation, the interests of its stockholders or members will be preserved under the arrangement.' However, at the same time, it added 328 relating to dismissal unless proceedings were taken under Chapter X, stating that this 'codifies the law of the United States Realty & Improvement case,' H.Rep.No. 2320, 82d Cong.2d Sess. 19 (1952), 2 U.S. Code Cong. & Ad. News 1980 (1952). Confronted by this puzzlement wherein Congress 'codified' the United States Realty case simultaneously with the destruction of its principal rationale, the Supreme Court rested decision in General Stores Corp. v. Shlensky, 350 U.S. 462, 468, 76 S.Ct. 516, 520, 100 L.Ed. 550 (1956), on the basis that two inferior courts had not 'transcended the allowable bounds' of discretion in concluding that the debtor 'needed a more pervasive reorganization than is available under c. XI.' The test as to the respective spheres of the two chapters, the Court said, is 'the needs to be served.' 350 U.S. at 466, 76 S.Ct. 516.[3]
 
 
 10
 Although the 'needs' test yields fairly certain and predictable results in cases at the ends of the spectrum, it is a highly erratic guide in the broad middle range. No one would doubt that a seriously embarrassed giant corporation, with secured and unsecured publicly held debt, trade and other general creditors, and preferred and common stock, 'needs' reorganization under Chapter X; no one would doubt either that a small company requiring nothing more than a moratorium from trade creditors 'needs' only the swift and simple procedures of Chapter XI. But corporations like the debtors here 'need' features of both chapters. They would receive many benefits from Chapter X-- among others, the disinterested trustee required whenever the indebtedness is $250,000 or more, 156; the investigation and report he is required to make, 167(3), (5); separate representation of every class of security holders, 206, 209-- in contrast to the single creditors' committee of Chapter XI, 338; the preparation of a plan by the trustee and its scrutiny by the SEC, 167(6), 169, 172-173; the more informative presentation of the plan to security holders, 174-175; and the 'fair and equitable' requirement, 174, 221(2), and the concomitant possibility of modifying the rights of secured creditors and stockholders as well as of unsecured creditors, 216. But all these 'needs,' so well provided for in Chapter X, are met only at a heavy price of expense, delay and consequent uncertainty. Corporations like the debtors also 'need' the economy, the simplicity and the speed of Chapter XI. The 'needs' for the two chapters are not only conflicting but largely imponderable; we know of no scale sufficiently sensitive to weigh the near certainty of achieving a Chapter XI arrangement that may not be altogether fair and equitable against the possible emergence of a better plan from a Chapter X proceeding during which the patient may die before an operating room is ready or for which the fees of the surgeon and others in attendance may exceed the patient's means. In the absence of studies of the workings of the two chapters, decision by the district judge is almost bound to reflect his particular experience and predilections. Appeals from such decisions bring delays which give creditors and stockholders the worst of both worlds. Yet, without meaningful standards for decision, appellate courts can do little more than sustain the district judge, save in a most flagrant case. The consequence, particularly in a multijudge district, would be that the substantial rights of the parties would depend on the accident of the calendar-- in defiance of the memorable admonition, 'It will not do to decide the same question one way between one set of litigants and the opposite way between another,' Cardozo, The Nature of the Judicial Process 33 (1921). To be sure, there are other situations where district judges must weigh disparate factors and are reviewed only for abuse of discretion. But typically these are on such preliminary issues as the place of trial, 28 U.S.C. 1404(a), the grant of permissive intervention, F.R.Civ.P. 24(b), or issuance of a provisional remedy, not on such an ultimate right as strict priority vel non.
 
 
 11
 The felt demand for bringing some order out of this chaos is thus altogether understandable. One method, a test of amount of debt, such as Chapter X provides for the mandatory appointment of a disinterested trustee, 156, and submission of plans to the SEC, 172, lies beyond judicial competence. Cf. Friedmann, Law in a Changing Society 155 (1959). Another, that any readjustment of publicly held securities will require resort to Chapter X has been authoritatively disapproved. General Stores Corp. v. Shlensky, 350 U.S. at 466, 76 S.Ct. 516. But we do not read that decision as precluding a court of appeals from ruling that the need for a readjustment of publicly held debt creates a presumption in favor of Chapter X, whereas a case calling only for modification of the claims of trade creditors or others who have had private dealings with the debtor is presumptively to be handled under Chapter XI. Indeed, Mr. Justice Douglas said in General Stores: 'It may well be that in most cases where the debtor's securities are publicly held c. X will afford the more appropriate remedy.' 350 U.S. at 466, 76 S.Ct. at 519.
 
 
 12
 There is much to be said in favor of such a standard, in addition to the not inconsiderable merit of providing guidelines to district judges and discouraging appeals or at least shortening their course.[4] Where debt is publicly held, it is likely to have been the subject of a registration statement filed with the SEC. Although that agency has no responsibility for the venture's collapse, its staff has necessarily acquired some familiarity with the situation[5] and, particularly when the debacle has come speedily, there may well be claims under 11 and 12 of the 1933 Act, 15 U.S.C. 77k-77l. Public investors are far more likely than trade creditors to be ill-informed as to what went wrong and as to the likelihood of the reorganized venture going right, see SEC v. Crumpton Builders, Inc., 337 F.2d 907 (5 Cir. 1964), and they lack the trade creditors' opportunity for advantage from profitable dealings with a management well disposed to them. Moreover, the new securities to be issued in respect of public debt will themselves be traded; they would have to be registered but for the exemption conferred by 264 and 393, and it is thus reasonable that the SEC should have some look at them in advance. The case of trade or other private creditors with whom we dealt in Grayson-Robinson is radically different. Chapter XI, which 'was sponsored by the National Association of Credit Men and other groups of creditors' representatives expert in bankruptcy,' 310 U.S. at 450 fn. 8, 60 S.Ct. at 1051, provides for such creditors what had long been authorized by 12 of the Bankruptcy Act of 1898, 30 Stat. 549, and before that by 43 of the Act of 1867, 14 Stat. 538. Neither of these sections had any 'fair or equitable' requirement; the safeguards were the proportion of creditor assent and a judicial finding that the arrangement was in the interests of the creditors and, under the Act of 1898, that the bankrupt had not been guilty of conduct barring a discharge and that the offer had been properly made and the acceptances properly obtained.[6] The framers of the 1952 amendments recognized that for such proceedings the 'fair and equitable' standard, imposed by 366 of the Chandler Act as interpreted by the courts, was neither 'practicable or realistic.' H.Rep.No.2320, 82d Cong.2d Sess. 21 (1952); U.S.Code Cong. & Ad.News 1981-1982 (1952). In effect, Congress reaffirmed the traditional capacity of trade creditors to safeguard their own interests. Security holders, not trade creditors, were the people Congress had primarily in mind when it enacted Chapter X and its predecessor, 77B, see 310 U.S. at 448-450, 60 S.Ct. 1044; and preoccupation with the problem of transfer to Chapter X under 328 should not lead courts to forget that 130(7) and 146(2) are still in the Bankruptcy Act.
 
 
 13
 To say that the need for readjustment of publicly held debt creates a presumption in favor of Chapter X necessarily implies that in some cases it may be overcome. A rather obvious case would be if a previously prosperous debtor encountered financial adversity just when a sinking fund instalment or an entire debenture issue fell due, and needed only a short extension to work matters out, with the creditors' position unimpaired in all other respects. Another would be when an arrangement proposed by a management not suspected of wrongdoing substantially met the fair and equitable test, either because the sacrifices imposed on creditors were altogether minor or because (as would be quite possible when the stock was closely held or the management had contract arrangements which it would voluntarily modify to the debtor's advantage) adequate compensation by stockholders was provided. The contrary presumption, favoring Chapter XI when only the claims of private creditors need adjustment, might be overcome, for example, if the creditors were to receive securities that would be likely to be traded or if there were seriously conflicting interests among them. We do not attempt an all-inclusive catalogue save to say that the exceptions must not be allowed to grow too luxuriantly if the standard is to serve its purpose of promoting certainty.[7]
 
 
 14
 Although the arrangement here did not go nearly so far beyond the bounds of the exception we envisage as the 15 cents on the dollar arrangement in Crumpton Builders, it went too far. Appellees characterize the adjustment as minor but we think it far from that. The interest on the debentures due January 1, 1964, is postponed for six years; that due July 1, 1964, is cancelled; and all sinking fund obligations are eliminated. All interest after July 1, 1964, is not simply put on an income basis but made non-cumulative, and income is defined in a manner, widely departing from normal accounting concepts, whereby principal payments to existing trade and other unsecured creditors are considered as an expense of future years. The result is that such payments would come out of the claims of the debenture holders to future income interest payments unless the income sufficed for both-- a happy prospect that would appear somewhat remote in view of the $274,470 annually required for full debenture interest alone. Indeed, the arrangement would seem to be unfair in this respect not only as between the debenture holders and the stockholders but as between the debenture holders and the other creditors, who are given a preferred position as to future income for which their foregoing of interest is hardly a sufficient compensation. Yet the only advantages accruing to the debenture holders for all these sacrifices are a reduction in the price and an extension of the period for converting the debentures into stock that now is worthless or nearly so. Moreover, the proposed new $2,500,000 first mortgage, even if procured for a smaller annual interest charge than the existing $1,500,000 mortgage, will place another $1,000,000 ahead of the unsecured creditors; assuming that further funds are needed and that the risk is thus one that the unsecured creditors must take, it is hard to see why they should not reap the entire gain if the gamble succeeds, rather than allow the stockholders to have what essentially is a free ride. The case would be different if the stockholders themselves were providing new money on a non-priority basis-- what had been the typical way of preserving the stockholders' position consistently with Northern Pacific R.R. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913). See Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 121-122, 60 S.Ct. 1, 84 L.Ed. 110 (1939).
 
 
 15
 We repeat our dislike at having to insist on a course which scarcely a creditor or stockholder has sought and which may lead to disaster. If we were holders of the debentures, we might well prefer an arrangement that could be speedily carried out, even though not truly fair and equitable, to the risk that an endeavor to procure a better one might result in none at all. But some meaning must be given to Congress' 'codification' of the United States Realty case, and we are unable to see what lesser standard would do that than to insist on transfer to Chapter X when publicly held debt is to be subjected to a substantial adjustment so far departing from the fair and equitable principle as that here proposed.
 
 
 16
 Reversed.
 
 
 
 [1]
 To induce Emprise to make the loan, Canandaigua paid $40,000 and granted concessions for programs, food, beverages, tobacco and parking
 
 
 [2]
 Under Chapter XI, in contrast to Chapter X, there can be only one creditors' committee. 338
 
 
 [3]
 A further pronouncement by the Supreme Court is expected this term as a result of the grant of certiorari, SEC v. American Trailer Rentals Co., 376 U.S. 948, 84 S.Ct. 971, 11 L.Ed.2d 969 (1964), to review In re American Trailer Rentals Co., 325 F.2d 47 (10 Cir. 1963). We have considered whether we should defer decision pending the Supreme Court's ruling in that case. But the Court's decision may well turn on special facts, and we have thought it better to decide this case, so that the parties can determine whether to go forward or seek certiorari
 
 
 [4]
 Since appeals from the grant or denial of a motion under 328 usually have the practical effect of a stay even if none has been granted, we would think it proper to prefer such appeals and to hear them on short notice, as we often do with respect to appeals from the grant or denial of injunctions; the existence of definite standards should make it possible to dispose of most such appeals rather speedily
 
 
 [5]
 The extent of such familiarity is likely to be increased as a result of the recent expansion of the SEC's jurisdiction over unlisted securities under the Securities Exchange Act of 1934 by Pub.L. No. 88-467, 78 Stat. 565 (1964)
 
 
 [6]
 Chapter XI requires in addition a finding of feasibility, 366(2)
 
 
 [7]
 In most cases the presumptions we propose would produce the same results as the more flexible criteria suggested in Judge Wisdom's thoughtful opinion in SEC v. Crumpton Builders, Inc., supra, 337 F.2d 907. Our presumptions, which probably would send more public investor cases to Chapter X and retain more trade creditor cases in Chapter XI, seem to us to accord somewhat more closely with the purpose of Congress as gleaned from reading the Chandler Act as amended along with the Securities Act of 1933, and to yield more predictable results